Sam STEIN, Individually and d/b/a
Sam Stein Security Company
Appellant/Appellee,

v.

AMERICAN RESIDENTIAL
MANAGEMENT, INC.,
Appellee/Appellant.

No. A14–88–613–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 2, 1989.
Rehearing Denied Nov. 30, 1989.

Eileen F. O'Neill, Sherie M. Potts, Thomas G. Rayfield, Richard L. Ellison, Houston, for appellant.

Hartley Hampton, Joe Crabb, John W. Wiggins, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and DRAUGHN, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

In this case we must decide the effect of a Mary Carter agreement on contribution rights among joint tortfeasors, in light of *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19 (Tex.1987).

### I.

The underlying tort action arose out of a fatal assault in an apartment complex. All parties agree that Sandra Jacobs was killed by her husband Huey Jacobs. Other family members and bystanders brought a wrongful death and survival action against the apartment management company (ARM), the security provider (Stein), and additional parties who were dropped from the litigation before trial. Huey Jacobs had no part in the trial, evidently because of his confinement in the Texas Department of Corrections.

Stein concluded a Mary Carter agreement with the plaintiffs, according to the terms of which Stein guaranteed them a $300,000 recovery, with his obligation to be reduced by one half of any excess recovery. ARM responded by seeking a realignment of parties. The trial court ordered such a realignment, whereby Stein received no peremptory challenges. Trial proceeded on the plaintiffs' principal claims against ARM and ARM's cross-action against Stein for contribution. The Mary Carter contract became a significant part of the trial, as all parties acknowledged its existence (and focused on it) before the jury. The jury found for the plaintiffs. Liability was assessed at 25% responsibility each against Sandra Jacobs, ARM, Stein, and one of the individual plaintiffs. Damages were found to be $1,890,000, with $1,000,000 of the total assessed in favor of Sandra Jacobs' "estate." The court initially awarded judgment on the verdict; later, however, ARM persuaded the court to remit total damages

to $1,000,000. This result grew out of an agreement between ARM and the plaintiffs that the plaintiffs would accept the remittitur in exchange for ARM's promise to forego pursuing a new trial or appeal.

After ARM paid the million dollars, it asked the court to find Stein jointly and severally liable and order Stein to pay contribution to ARM. The trial court reached something of a compromise resolution, in that it awarded ARM contribution from Stein as to the *estate's* recovery but *not* as to the recovery by the other claimants. Both ARM and Stein appeal. (The plaintiffs are not involved in this appeal at all). Stein objects to the grant of any contribution at all, and ARM objects to the denial of contribution respecting the individual plaintiffs. We must decide how a Mary Carter agreement impacts the issue of contribution among joint tortfeasors.

### II.

■ That question does not present itself cleanly because of several threshold matters. One irregularity relates to the Mary Carter contract which was admitted into evidence—*unsigned.* No one noticed the blank signature lines until after the trial. The trial court commented on this in post-verdict proceedings:

> the existence of the agreement was well known and was fully and openly discussed where everybody knew where they stood relative to it. It was given to the jury immediately, the jury was voir dired on the existence of the agreement. And, it was the first one that I'd ever had anything to do with that it dealt with so openly and obviously in the trial of this particular case.

ARM urges us to find the agreement unenforceable as failing to comply with TEX.R. CIV.P. 11, which governs agreements between attorneys. Rule 11 provides two avenues for recognition of such agreements:

> (1) where the agreement is written, signed, and filed of record, or

> (2) where the agreement is made in open court on the record.

According to ARM, this instrument fails the first requirement because it was unsigned, and it fails the second requirement because it so obviously violates the first part of the rule. In other words, the requirement of a signed writing would be rendered pointless if an unsigned writing could simply qualify under the second part of the rule.

■ In our view this argument proves too much. First, we are disinclined to read rule 11 in such a way that the legitimate expectations of the parties become frustrated. There is no reason that noncompliance with one portion of the rule precludes satisfaction of the other. *See* TEX.R. CIV.P. 1 (requiring a construction of the rules with a view toward fair adjudication and the greatest possible efficiency). As the trial judge pointed out, "But, it was introduced without objection. I mean that was clearly—that was the centerpiece of the whole trial, that was the agreement."

■ Second, it is not altogether free of doubt that the drafters of rule 11 ever had in mind scenarios such as a Mary Carter arrangement. To be sure, there was an "agreement" in the dictionary sense of the term. It seems, however, that rule 11 is chiefly designed to take trial judges out of the business of adjudicating swearing matches between the parties to the agreement; strangers to the agreement ordinarily lack standing to contest the validity of a rule 11 accord. The whole purpose of this statute of frauds principle has meaning only in the context of a dispute between actual participants to the bargain. ARM's complaint here belongs to the plaintiffs, and the plaintiffs bring no appeal.

Finally, a Mary Carter agreement raises concerns in the area of evidence as much as in the regime of civil procedure. There is a rough analogy to the rule that hearsay admitted without objection will not be denied probative value. TEX.R.CIV.EVID. 802. The analogy is concededly imperfect because a Mary Carter contract does not fit neatly into a particular pigeonhole: it has both procedural and evidentiary aspects. Yet rule 802 represents merely a specific example of a more general policy, that the courts will treat as evidence what the parties treat as evidence. That larger principle (whether denominated waiver, estoppel, or some other doctrine) governs the situation before us. To borrow from another context, if it walks like an enforceable agreement, talks like an enforceable agreement, and quacks like an enforceable agreement, we will regard it as one. Crosspoint one is overruled.

Similar considerations lead us to reject crosspoint two, which alleges that the agreement lacked court approval on behalf of the minors involved. *See* TEX.R.CIV.P. 44 (requiring approval of the court for settlement by a minor). But no minor now attacks the status quo. Indeed, the guardians ad litem expressly approved it. Plainly, the court also approved of the settlement.

Another difficulty arises out of the procedural posture of the case, namely the question of proper parties. It is argued that the jury charge erroneously inquired about damages to the estate, whereas an estate has no juridical status in litigation. *See Price v. Estate of Anderson*, 522 S.W.2d 690 (Tex.1975). The argument is that litigation on behalf of the estate could not proceed without participation of either a personal representative or all heirs. It is true that no personal representative took any part in the case. ARM would therefore deny effect to the contract on the ground that it lacked the support of one heir—Huey Jacobs. Stein views Huey Jacobs' absence as irrelevant, given that there is no serious dispute over the murderer's identity, and that so-called killer heirs incur a legal disability from inheriting ill-gotten gains. ARM concedes the rule of noninheritance, but claims it comes into play only as a result of formal adjudication that a constructive trust be imposed.

■ We do not regard the lack of a formal finding as sufficient reason for voiding the Mary Carter release. No party objected to the jury charge on the ground that the estate did not belong. In fact, the judgment has become final and is now paid. The release agreement must stand or fall not on the question of proper parties, but

on its legal merits. We therefore turn to that issue.

### III.

The Mary Carter agreement is a relatively modern device for producing a partial settlement. The litigation before us represents a typical example of how the device works. Here the plaintiffs narrowed their focus to two defendants (Stein and ARM), with one defendant (Stein) agreeing to guarantee payment of a minimum recovery. That settling party has an incentive to assist the plaintiffs' case against the other defendant, because the contract provides for a reduction of the settling party's liability, the size of the reduction depending on the size of the total verdict: the more successful the settling defendant is in convincing the jury to find for the plaintiffs, the less he will actually have to pay.

To say that Mary Carter agreements have generated debate would be an understatement. Courts and commentators continue to struggle for successful methods of accommodating them into the adversary framework. *See generally* Note, *It's a Mistake to Tolerate the Mary Carter Agreement*, 87 COLUM.L.REV. 368 (1987); Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 SW.L.J. 779 (1978). The Texas Supreme Court has not passed squarely on the question of their validity, but the Court has devised special procedures for dealing with them. *See* Radnofsky, *Complex Settlement Agreements*, 28 S.TEX.L.J. 435, 455–58 (1977). Because ARM asks us to declare Mary Carter contracts wholly void as against public policy, we begin by examining existing cases and enactments. In this way it may be possible to discern the various values and considerations which make up Texas public policy.

One clear theme throughout Texas law is that settlement is preferred to litigation. *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex.1986); *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977);

*McGuire v. Commercial Union Ins. Co.*, 431 S.W.2d 347, 352 (Tex.1968). This preference also surfaces in areas outside of caselaw. For example, TEX.R.CIV.EVID. 408 prohibits the use of settlements and settlement offers as evidence of liability, on the theory that a contrary rule would discourage compromise and fuel litigation.

A second recurring strain relates to the adversary process. The Texas civil justice system rests on the premise that truth will emerge most effectively from the vigorous presentation of two opposing views, each side having the incentive and opportunity to test the other's case. It is axiomatic that the litigants themselves bear the burden of pressing the fight for justice: judges neither conduct voir dire examination of jurors, nor comment on the weight of the evidence. The task of the judge is largely to regulate this process of adversarial presentation. The Supreme Court has applied this principle to Mary Carter cases in order to preserve the truth-seeking character of our dispute resolution system.

In *Simmons* the Court declared a Mary Carter exception to the general rule of inadmissibility for settlement contracts. 558 S.W.2d at 858–59. In *Scurlock* the Court approved of the trial court's allocation of peremptory challenges in a Mary Carter context.[1] *See* 724 S.W.2d at 5; *see also* TEX.R.CIV.P. 233 (providing for alignment of parties). Likewise, the Supreme Court created a Mary Carter exception to the standard framework for analyzing res judicata and collateral estoppel. *Scurlock*, 724 S.W.2d at 7. Justice Kilgarlin's opinion noted that a Mary Carter verdict is "one having the potential of being obtained without full and fair litigation." *Id.* For this reason, he wrote, the decision whether to allow preclusion should be left to the trial court's discretion. *Id.* These precedents are ample to persuade us that our analysis should be guided by a willingness to advance the policies enunciated by the

---

1. The High Court disapproved of the court of appeals' rationale for reaching the same result, *see* 724 S.W.2d at 5, said rationale apparently being a holding that error had not been preserved. *See* 701 S.W.2d 4 (Tex.App.—Corpus Christi 1985), *rev'd,* 724 S.W.2d 1.

Supreme Court: preservation of the adversary system and promotion of settlement.[2]

We move next to the applicable principles governing contribution rights and settlements. The Supreme Court examined this area in *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19 (Tex.1987). The issue there was somewhat the converse of ours. Like this appeal, *Jinkins* posed a question of contribution rights between alleged joint tortfeasors where one defendant settles with the plaintiff and the other does not. Unlike this appeal, *Jinkins* focused on the rights of the *settling* defendant; we are concerned with the rights of the *nonsettling* defendant.

In its opinion the Court decided to disallow contribution rights to the settling defendant. The Court expressed uneasiness about the prospect of permitting that defendant "a right to, in effect, buy the plaintiff's claims and prosecute the other jointly responsible parties." *Id.* at 22. This uneasiness grew out of concern over perversion of the adversary process: "We can, however, envision that the settling defendant's unusual posture as surrogate plaintiff, co-defendant and cross-plaintiff will confuse a jury and possibly prejudice the remaining parties." *Id.*

Because *Jinkins* involved no Mary Carter agreement, the policy considerations present there apply here with even greater force. It is clear from the *Simmons–Scurlock* line of decisions that courts must keep a short leash on Mary Carter agreements' potential for wreaking havoc on the civil justice system. Fidelity to these various pronouncements requires us to find a Mary Carter settlement ineffective to destroy an otherwise available contribution claim. Crosspoint three is sustained in part. It is unnecessary to go beyond this holding, as ARM would have us, and strike down such contracts in their

entirety. That larger question requires resolution by the Supreme Court, and we express no opinion on it.

This holding is supported by the law's preference for settlement over litigation. Only a mechanical jurisprudence could characterize Mary Carter arrangements as promoting compromise and discouraging litigation—they plainly do just the opposite.[3] To argue that a partial settlement at least partially advances the law's preference is akin to advocating a partial jump across the canyon. We draw additional support from the Court's discussion of loss allocation in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984). There the Court sought to develop a rational scheme of comparative contribution, and if any consistent motif emerges from the case, it is that of sensible modernization. The Court repeatedly looked not to black letter contribution rules, but rather to the reasons behind them. We have attempted to do that in this case. *Cf. Haring v. Bay Rock Corp.,* 773 S.W.2d 676, 680–81 (Tex.App.—San Antonio 1989, n.w.h.) (analyzing the policy of *Jinkins* in a dissimilar factual setting). If we allowed a Mary Carter agreement to override contribution rights, we would be allowing the collusion of two parties to destroy a legal claim which would otherwise belong to a nonparticipating person—a complete stranger. That we decline to do.

Stein's points of error are overruled. We modify the judgment to provide contribution rights in full. As modified the judgment is affirmed.

---

**2.** The Supreme Court has also promulgated rules of court for effectuation of these policies. *See, e.g.,* Tex.R.Civ.P. 1 ("The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication...."); Tex.R.Civ.Evid. 102 ("These rules shall be construed to secure fairness in administration ... to the end that the *truth* may be ascertained and proceedings justly determined) (emphasis added).

**3.** The policy of favoring settlement is "a poor rationale for accepting the Mary Carter agreement since it is only a *partial* settlement. On the contrary, rather than settling all issues among the parties, the Mary Carter agreement encourages litigation; the very point of the agreement is to continue litigation against the nonsettling defendant." Note, 87 Colum.L.Rev. 368, 379 (1987) (footnotes omitted) (emphasis in original).