**Sonya Renee WEBSTER, Appellant and Appellee,**

v.

**Waldine LIPSEY, Appellee and Appellant.**

**No. C14–88–00552–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 8, 1990.

Rehearing Denied March 1, 1990.

Joseph D. Jamail, W. James Kronzer, Houston, William W. Kilgarlin, Austin, for appellant and appellee.

Michael S. Goldberg, Patrick Zummo, Daniel O. Goforth, Houston, Wayne H. Prescott, Austin, for appellee and appellant.

Before PAUL PRESSLER, CANNON and ELLIS, JJ.

## OPINION

PAUL PRESSLER, Justice.

A negligence and products liability case involving a Honda three-wheeled all-terrain cycle (ATC) was brought by appellant Webster. We affirm the trial court's judgment.

On November 24, 1984, Sonya Renee Webster (Renee) was a passenger on an ATC driven by William Lipsey (William), a high school classmate. The ATC turned over and Renee was seriously injured. She originally filed suit against the manufacturer and distributors of the ATC, Honda Motor Co., Ltd.; American Honda Motor Co., Inc.; Honda R & D Co., Ltd.; and Meador–Brady Management Corp. d/b/a Pasadena Honda, (collectively referred to as "the Honda defendants") and against Waldine Lipsey, William's mother. Shortly before trial, the Honda defendants joined William as a third-party defendant. At that time, the statute of limitations barred Renee from suing William.

On February 29, 1988, Renee and Mrs. Lipsey "by her insurance carriers" entered into an agreement that Mrs. Lipsey's insurance policies would provide coverage of up to $9.3 million to William if the jury found that his negligence was the sole cause of the accident. In return, Renee agreed to

pursue the case against the Honda defendants, "there being no doubt that the evidence clearly establishes that Honda is the only cause of this occurrence and the injuries and damages to Sonya Renee Webster and her family." On March 7, 1988, Renee entered into a Mary Carter settlement agreement with the Honda defendants which guaranteed her a $7.5 million payment.

The case was tried to a jury. The jury found that the ATC was defective and that William Lipsey had been negligent and apportioned ninety-five percent causation to the ATC and five percent to William. The jury awarded $16,597,602 in damages which the trial court apportioned as follows: $15,767,721.90 against the Honda defendants and $829,880.10 against Mrs. Lipsey on an agency theory. The judgment also incorporated the terms of the Mary Carter agreement and reduced the Honda defendants' liability to the $7.5 million guarantee. Both sides appeal the judgment.

Mrs. Lipsey appeals on seven points of error. In point of error one, she complains that Question No. 1 concerning agency failed to state a necessary element. That question asked the following:

> On the occasion in question was William Lipsey operating the ATC in furtherance of a mission which was in whole or in part for the benefit of Waldine Lipsey? You are instructed that William Lipsey was acting in furtherance of such a mission if, at the time of the incident in question, one of his purposes in riding the ATC was for the business welfare of the Lipsey family.

The parties agree than an essential element of proof of agency is that the alleged principal has the right to assign the agent's task and to control the means and details of the process by which the agent will accomplish the task. *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.). According to the Texas Pattern Jury Charge, if the right to control the details of the mission is undisputed, language concerning control may be omitted from the agency question. 1 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 6.10 (1987). Mrs. Lipsey contends, however, that control was disputed in this case and that Question No. 1 should have asked whether William's operation of the three-wheeler was *subject to her control as to the details of the mission.* Renee argues to the contrary that Mrs. Lipsey's control was established as a matter of law, making the submission of that additional element unnecessary. Renee asserts in a cross point that the trial court erred in overruling her motion for a partial directed verdict on the issue of agency because the evidence conclusively established an agency relationship between Mrs. Lipsey and her son.

On the day of the accident, William had invited Renee to the family's ranch to ride horseback. The plan was to move some cattle from one field to another and then go riding. William was transporting Renee to the barn on the ATC. Mrs. Lipsey asserts in her brief that she did not control the details of William's work on the ranch and, in fact, did not know that William intended to use the three-wheeler on that day or that Renee would be a passenger.

Mrs. Lipsey testified that following her husband's death in 1982, she took over the "whole responsibility" of the ranch with the help of her two sons. She let the boys take care of the outside to the extent that "[t]hey'd find out what had to be done, they'd come and ask me and, if I agreed, we agreed together." She concurred that she had the final decision-making power. Mrs. Lipsey also agreed that she was in charge of the use of the ATCs after her husband's death. When the Lipseys first owned them, they were used primarily for recreational purposes. Later they were used in the operation of the ranch, primarily for getting the horses. William could use the ATC at any time without asking her permission; yet he would have obeyed her had she told him he could not drive it. At the time of the accident Mrs. Lipsey knew what the boys and Renee were doing although she thought they were all driving to the barn in the Jeep. Had she seen

Renee get on the ATC, she probably would have suggested they instead take the Jeep. William and his brother Scott testified that they ran the outside work while their mother took care of the book work. However, they both agreed that if Mrs. Lipsey told them to do something, they would do it.

The test here is the right to control. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex.1964). It is clear that while William and Scott were allowed a great deal of input into the operation of the ranch, they deferred to their mother as the ultimate authority. Had she told William not to perform a chore in the company of a guest or not to ride the ATC with Renee as a passenger, he would have obeyed her. Therefore, it is undisputed that Mrs. Lipsey had the *right* to control the details of William's mission whether or not she actually exercised it. Under the dictates of the Texas Pattern Jury Charge, Question No. 1 did not fail to state a necessary element of agency, and point of error one is overruled. In light of this ruling, there is no need to rule on Renee's cross point.

█ In point of error two, the argument is made that the trial court erred by refusing to dismiss Renee's cause of action against Mrs. Lipsey as Renee had previously agreed and admitted that the Honda defendants were the only cause of her injuries. At issue here is the February 29, 1988, agreement between Renee and Mrs. Lipsey and her insurance carriers, which read in pertinent part:

> In the highly unlikely event that the jury finds that William Lipsey was negligent and that such negligence was the sole cause of this tragic accident, the insurance companies for Waldine Lipsey agree that Waldine Lipsey's policies of insurance will provide insurance coverage to William Lipsey just as if he was a party defendant to this lawsuit. The total amount of insurance available is $9,300,000.00.
> In consideration of the foregoing, Joseph D. Jamail, agrees on behalf of all the plaintiffs to actively pursue and prosecute his clients' case against the Honda defendants, there being no doubt that

the evidence clearly establishes that Honda is the only cause of this occurrence and the injuries and damages to Sonya Renee Webster and her family. Jamail by necessity will continue to keep Mrs. Lipsey in as party defendant so that the jury may assess the evidence. Joseph D. Jamail, on behalf of the plaintiffs, agrees that the plaintiffs will try their case in a manner consistent with the placing of responsibility upon the Honda defendants, where it so obviously belongs. All of the foregoing is consistent with the facts and with the manner in which the cause has been prosecuted to date.

> This agreement cannot be used in evidence for any purpose, nor alluded to during this trial.

Mrs. Lipsey argues that the agreement was a judicial admission by Renee that the Honda defendants were the only cause of the accident; that the agreement contractually estopped Renee from pursuing any cause of action against Mrs. Lipsey; that Renee was equitably estopped from taking a position at trial contrary to the agreement; and that Renee waived her right to prosecute claims against the Lipseys.

█ The February 29th agreement could not serve as a basis for dismissing the cause of action against Mrs. Lipsey. The parties clearly agreed to leave Mrs. Lipsey as a defendant. The agreement was not a judicial admission. A judicial admission is a formal act, done in the course of judicial proceedings, which dispenses with the production of evidence and takes the matter out of the domain of proof. It is not evidence but is a substitute for evidence. *Hercules Exploration, Inc. v. Halliburton Co.*, 658 S.W.2d 716, 719 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). The document at hand specifically provided that it was not to be used in evidence for any purpose. Such a statement would negate its being used as a substitute for evidence as well. Furthermore, to qualify as a judicial admission, the statement must be unequivocal. *United States Fidelity & Guaranty Co. v. Carr*, 242 S.W.2d 224, 229 (Tex.Civ.App.—San Antonio 1951, writ ref'd). In this agreement, Renee protected

herself by retaining the right to submit *all* of the evidence to the jury. This is not an unequivocal renunciation of her case against Mrs. Lipsey.

The February 29th agreement contains no language barring Renee's cause of action against Mrs. Lipsey. Indeed, it provided that she was to remain a party defendant so that the jury could assess the evidence. Given that language, the agreement cannot serve as grounds for dismissal under any of Mrs. Lipsey's arguments. Renee clearly was not relinquishing any rights against Mrs. Lipsey. Mrs. Lipsey argues that she bargained for and received the written promise of Renee and her counsel to pursue and prosecute the case against the Honda defendants. While only a week elapsed between the Lipsey and Honda agreements, the latter settlement is evidence that Renee's counsel indeed pursued those claims. Whatever difficulties Mrs. Lipsey encountered in her defense were due primarily to the nature of the Mary Carter agreement, which continues to be a viable settlement device in this state. The existence of the February 29th agreement did not require the trial judge to dismiss Renee's cause of action against Mrs. Lipsey. Point of error two is overruled.

■ Points of error three and four concern Question No. 2, which inquired about William's negligence, Mrs. Lipsey's negligence and her negligent entrustment of the ATC to William. The jury found that only William was negligent. In point of error three, Mrs. Lipsey argues that the jury's finding of defective design established as a matter of law that William was not negligent because a user of a product cannot be negligent in not discovering a product defect. In point of error four, she argues that the trial court erred in not instructing the jury that failure to discover or guard against the possibility of a product defect is not negligence.

Mrs. Lipsey's argument is that the ATC's design will not safely accommodate a passenger and that this defect in design is not apparent to the user. William did not know the ATC was defective and was not warned about the danger of carrying a passenger. Therefore, she claims that because he did not have actual knowledge of the defect, he was not negligent as a matter of law under *Keen v. Ashot Ashkelon, Ltd.,* 748 S.W.2d 91 (Tex.1988). In *Keen,* the plaintiff knew of the risk that trailers could sometimes fall. However, the trailer that caused his injury had a defective sand shoe, something Keen did not know. Thus, he had no knowledge of the dangerous condition that caused the accident. *Id.* at 92–93.

The jury was asked to consider at least eight different areas in which William might have been negligent:

(1) in operating the ATC with a passenger;

(2) if failing to warn Renee Webster of the danger of riding as a passenger on the ATC;

(3) in driving the ATC at the speed he was driving under the circumstances and conditions then existing;

(4) in failing to maintain proper control of the ATC;

(5) in failing to turn the ATC properly;

(6) in failing to make a proper application of the brakes;

(7) in failing to take his hand off the throttle;

(8) in failing properly to check and inflate one or more of the tires on the ATC in question.

Several of these did not involve the passenger design defect. The jury did not state on what basis it reached its conclusion that William was negligent. Therefore, William's knowledge of the design defect may have no bearing on his negligence.

There is evidence that William knew the ATC handled differently with a passenger as he testified to that effect. While he may not have recognized this as a design defect per se, his knowledge distinguishes this case from *Keen*. *Keen* differentiated between a failure to guard against a defect (the defective sand shoe) and a voluntary encounter of a known danger (Keen's knowledge that trailers could sometimes fall coupled with his violation of the safety

rule not to pull alongside a trailer in motion or one in the disengagement process). *Id.* at 92. William's conduct is analogous to a voluntary encounter with a known danger. *Keen* is, therefore, not applicable, and point of error three is overruled. Point of error four is also overruled since there was no need for the trial court to instruct the jury in this regard.

■ In point of error five, Mrs. Lipsey claims that the trial court erred in allowing the settling defendants to participate at the trial and in final argument. Mrs. Lipsey argues that if Mary Carter settlements are not going to be outlawed, the most effective way to limit their distorting effect is to bar the settling defendants from any participation at trial. Renee characterizes her agreement with Honda as a minimum guaranteed payment rather than a settlement, but whatever the terminology, the complained-of effects are the same.

This court has considered Mary Carter agreements in at least two recent cases. *Stein v. American Residential Management, Inc.,* 781 S.W.2d 385 (Tex.App.—Houston [14th Dist.], 1989, n.w.h.); *Holby Valve Co. v. Holiday Inn–Galveston,* 783 S.W.2d 628 (Tex.App.—Houston [14th Dist.], 1989, n.w.h.). To quote the court in *Stein,* "To say that Mary Carter agreements have generated debate would be an understatement." *Stein* at 388. However, the court in *Holby Valve* stated that such agreements are valid under Texas law. The court in *Stein* declined to strike them down in their entirety, and left the resolution of that issue to the supreme court. *Holby Valve* at 634; *Stein* at 389.

For reasons that are disputed, the Honda defendants remained parties at trial. The argument for barring settling defendants from participating at trial might have merit under certain circumstances. There is no authority barring participation, and the trial court thus did not err in allowing the Honda defendants to participate. Under the agreement they retained a financial interest in Renee's recovery to the extent that they were to be reimbursed $.50 for each dollar recovered from the Lipseys up to $2.5 million. The jury was informed of

the settlement (although not of the amount), and in light of the percentage apportionment of negligence, it is highly possible that any prejudice which resulted was directed toward the Honda defendants. Point of error five is overruled.

■ Mrs. Lipsey asserts in point of error six that the trial court erred in the apportionment of jury strikes. The court allocated six strikes to Renee, four strikes to the Honda defendants and six strikes to the Lipseys. Mrs. Lipsey argues that following their agreement, Renee and the Honda defendants shared a common cause of action against the Lipseys. This required either that they be aligned together or that the Lipseys be allocated additional challenges to apportion the strikes more equitably.

■ In multiple party cases, prior to the exercise of peremptory challenges, the trial judge is to decide whether any of the litigants aligned on the same side of the docket are antagonistic on any issue to be submitted to the jury. "Side" means one or more litigants who have common interests on the matters with which the jury is concerned. Tex.R.Civ.P. 233. In determining whether antagonism exists, the trial court must consider information gleaned from pleadings, pretrial discovery, and representations made during voir dire examination. *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 5 (Tex.1986); *Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 768 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). The nature and degree of the antagonism, and its effect on the number of peremptory jury strikes allocated to each litigant or side, are matters left to the discretion of the trial court. *Diamond Shamrock,* 718 S.W.2d at 768. However, that discretion is not unlimited, and in *Patterson Dental Co. v. Dunn,* the supreme court noted that "in most cases a two-to-one ratio between sides would approach the maximum disparity allowable." 592 S.W.2d 914, 920 (Tex.1979).

The trial court found Renee and the Honda defendants' interests sufficiently antagonistic to equalize the peremptory challenges. As in *Scurlock,* the parties were not so antagonistic to one another, based

on the information the trial court had before it at the time it equalized strikes, that the apportionment produced an unfair advantage. 724 S.W.2d at 5. Despite the settlement, Renee sought a finding of defective design against Honda as part of her negligent entrustment claim against the Lipseys. During voir dire, Renee's attorney discussed the defect in the ATC. There was a defective design issue submitted to the jury. During the discussion of jury strikes, counsel for Honda stated that Honda was resisting any defect finding, probably, as the trial court pointed out, because of the negative press coverage. The above is indicative of sufficient antagonism between Renee and the Honda defendants. There was no abuse of discretion in the trial court's allocation of the peremptory challenges. Point of error six is overruled.

■ Finally, in point of error seven, Mrs. Lipsey argues that the trial court erred in excluding evidence of the Honda defendants' $2.5 million interest in a recovery by Renee under the Mary Carter agreement. Prior to voir dire, the trial court informed the jury of the existence and basic provisions of the agreement. While the jury was not told the *amount* of the Honda defendants' interest, the trial court stated the following: "Since the verdict of the jury, if any, against the Lipseys would decrease up to this proportion, the amount owed to the plaintiff by Honda under the terms of this agreement, Honda has by reason of this agreement a financial interest in the trial." During final argument, Renee's counsel revealed that the proportion of the credit was one-third. The jury was thus well aware that the Honda defendants had a financial interest in the verdict. Texas law does not require that the amount of that interest be disclosed. *See Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1; *Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801 (Tex.1978); *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977). The trial court did not err by excluding that evidence from the jury. Point of error seven is overruled.

Renee divides her appeal into two general areas. First, she argues that the trial court erred in holding that the evidence and answers to special issues legally supported a determination that the product was defective so as to permit any reduction in damages. Second, she argues the trial court erred in failing to enforce Mrs. Lipsey's pre-submission election of a dollar-for-dollar credit rather than a percentage set-off. Briefly, Renee seeks to avoid the application of the comparative causation scheme set forth in *Duncan v. Cessna Aircraft Co.,* either by eliminating the strict liability findings against the Honda defendants or by arguing that *Duncan* does not apply. 665 S.W.2d 414 (Tex.1984).

Renee's first four points of error concern Question 3, which read as follows:

QUESTION NO. 3

Was the design of the 1980 ATC 185 such that when it was used to carry Renee Webster as a passenger it created an unreasonable risk of harm to Renee Webster taking into consideration the utility of the ATC and the risk involved in its use?

Answer "Yes" or "No" in column 1 as to the design.

If you have answered "Yes" in column 1, was such design a producing cause of Renee Webster's injuries?

Answer "Yes" or "No" in column 2 as to producing cause.

|  | Column 1 Design | Column 2 Producing Cause |
|---|---|---|
| ANSWER: | _____ | _____ |

■ In point of error one, Renee argues that the trial court erred in overruling her motion to disregard and in rendering judgment based on the jury's answer to Question No. 3 because Question No. 3 did not submit a proper products design defect issue which could support a percentage reduction of Mrs. Lipsey's liability. Renee contends that Question No. 3 submitted her theory that the ATC was rendered defective as a result of William's transporting her as a passenger. The question, therefore, did not refer to "defect in design" but instead referred to "defect in use," which

cannot be legally attributed to the product manufacturer. *See Texas Industries, Inc. v. Lucas*, 634 S.W.2d 748, 759 (Tex.App.— Houston [14th Dist.] 1982), *rev'd on other grounds*, 696 S.W.2d 372, 378 (Tex.1984) (no action under principles of strict liability is tenable because the beam was not defective in and of itself but the "defect" manifested itself only in the lifting procedure).

*Lucas* did not specifically recognize a defect in use theory of strict liability. Question No. 3 properly submitted the strict liability test for defective design. *See Turner v. General Motors Corp.*, 584 S.W.2d 844, 847 (Tex.1979). Renee did not object to the form of the question and, indeed, proposed an *identical* issue. Her complaint is thus waived on appeal. Tex.R. Civ.P. 272; *West v. Carter*, 712 S.W.2d 569, 573–74 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Question No. 3 submits the theory of defective design Renee pursued against Honda at trial. Point of error one is overruled.

■■■■■ Renee next claims that the trial court erred in overruling her motion to disregard and in rendering judgment based on the jury's answer to Question No. 3 because it was an evidentiary issue included in her negligent entrustment cause of action against Mrs. Lipsey rather than a products defect claim. She argues that as such, the question became immaterial when the jury failed to find Mrs. Lipsey negligent in its answer to Question No. 2.

Question No. 3 does not necessarily relate to negligent entrustment. It is phrased in terms of the strict liability test for defective design. Question Nos. 2 and 3 concern different issues. The trial court could not disregard the jury's answer to Question No. 3 because it was material. *See United States Fire Ins. Co. v. Twin City Concrete, Inc.*, 684 S.W.2d 171, 173 (Tex.App.—Houston [14th Dist.] 1984, no writ). The Lipseys were entitled to seek liability findings against Honda as a settling defendant so that the Lipseys' liability could be reduced by the share of causation assigned to Honda. *Acord v. General Motors Corp.*, 669 S.W.2d 111, 117 (Tex.1984); *Duncan v. Cessna Aircraft Co.*, 665

S.W.2d at 429. There is no conflict between the answers to the two questions. The fact that the jury found the design of the ATC a producing cause of Renee's injuries does not mean that Mrs. Lipsey knew or should have known the ATC was defective. Points of error two and three are overruled.

■■■ In point of error four, Renee argues that there was no evidence to support the submission of the issue whether, or the finding that, the alleged defective design was a producing cause of her injuries. Renee maintains that when a product is dangerous or presents some risk of harm, the potential liability of the product supplier is based upon the supplier's exercise of its duty to warn of the possible dangers which may arise in foreseeable use of the product. Given the Lipseys' admissions that the manual warnings were adequate, there was no evidence to support the jury's affirmative finding regarding producing cause.

The adequacy of the warnings was the issue before the jury in Question No. 4 and is discussed in the context of Renee's points of error five through seven. Since the jury's answers to Question No. 4 are affirmed, this argument is not pertinent. In Question No. 3, the jury was asked to address only the issue of defective design. When an appellant brings a no evidence point of error, only the evidence and inferences that support the challenged jury finding are considered, and all contrary evidence and inferences are disregarded. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). There is evidence to support the jury's finding that the defective design of the ATC was a producing cause of Renee's injuries. Several experts testified that the three-wheeled ATC is unstable and that the addition of a passenger makes the stability problem worse. The vehicle's appearance is such that it invites passengers. There is seating capacity, placement for feet and a rail that looks like a passenger's hand rail on a motorcycle. At least two experts testified that the handling characteristics of the ATC are unpredictable when changing from one speed to

another and from one type of surface to another. Expert Randall Nelson attributed many of the ATC-related injuries and deaths to the vehicle's handling characteristics. Expert Franklin Johnson stated that the cause of this accident was the result of a combination of things, including certain design problems with the ATC. Point of error four is overruled.

Points of error five, six and seven have to do with Question No. 4, which asked the following:

### QUESTION NO. 4

At the time Honda sold the 1980 ATC 185 in question, did it fail to give adequate warnings of the dangers or adequate instructions for safe use of the 1980 ATC 185 which rendered the 1980 ATC 185 unreasonably dangerous as marketed?

Answer "Yes" or "No" in column 1 as to failure to give adequate warnings or instructions.

If you have answered "Yes" in column 1, then answer "Yes" or "No" in column 2 as to unreasonably dangerous.

If you have answered "Yes" in column 2, was such failure to give adequate warnings or instructions a producing cause of the occurrence in question?

Answer "Yes" or "No" in column 3 as to producing cause.

| Column 1 | Column 2 | Column 3 |
| --- | --- | --- |
| Adequate warnings or instructions | Unreasonably dangerous | Producing Cause |

ANSWER: _____  _____  _____

### INSTRUCTIONS

"Adequate warnings or instructions" means warnings and instructions that are given in such form that they could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use; and the content of the warnings and instructions must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with ordinary knowledge common to the community as to the product's characteristics.

In points of error five, six and seven, Renee argues that the trial court erred in overruling her motion to disregard the jury's answer to Question No. 4 because there was no evidence to support the submission of, or the jury's findings that, Honda failed to give adequate warnings or instructions for safe use; that this failure rendered the Honda vehicle unreasonably dangerous as marketed; or that this failure was a producing cause of the occurrence in question. These points of error must be reviewed according to the no evidence standard set out above.

A manufacturer, as well as all suppliers of a product, has a duty to inform users of the hazards associated with the use of its products. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591 (Tex. 1986). As explained in the jury instructions, a warning must both catch the attention of the user and convey the nature and extent of the danger. At the time the ATC was sold, Honda relied on the owner's manual and a decal glued to the vehicle to warn of the dangers associated with the ATC. This warning stated that it could not safely carry a passenger. At that time Honda failed to address ATC safety either through advertising or training.

The adequacy of the warnings in both the manual and the decal was put into issue by the Lipseys' contention that they never received an owner's manual and that there was no decal on the ATC. The ATCs were actually purchased by R.L. Lipsey, William's father, who died two years prior to the accident. At that time the Lipseys lived in Pasadena and visited the ranch on weekends. Mr. Lipsey bought an ATC 185 for William and an ATC 110 for Scott at Pasadena Honda. Months later, he returned to buy a second 110 for his grandson. Gene Brady, the owner of the dealership, testified that he discussed the ATCs

with Mr. Lipsey and told him passengers were not to ride. He also told Mr. Lipsey to have his sons read the manual and to make sure they understood it before they operated the vehicles. Mr. Lipsey, of course, was not available to confirm or deny this testimony.

Mr. Lipsey sent two employees to pick up the ATCs. Both men signed Owner's Delivery Reports stating that certain items had been explained to them and that they had received owner's manuals. However, one of the employees, Gerhardt Roenne, testified that he never saw the manuals for the first two vehicles but did receive one when he picked up the third ATC six to eight months later. He thought that manual was probably kept in a desk at Mr. Lipsey's business. Mrs. Lipsey, William and Scott testified they never saw any manuals. The dealership furnished purchasers envelopes in which to keep all documents pertaining to their vehicles. The box verifying that the envelope contained the owner's manual was not checked on the envelopes for William's and Scott's ATCs. In 1986 Honda added an owner's manual compartment to the ATC.

Gene Brady testified that according to his predelivery checklist, the appropriate labels, including the decals, were on the ATCs. He also stated that he had never seen an ATC arrive without the "No Passenger" label. However, the Lipseys and Gerhardt Roenne testified that they did not recall ever having seen "No Passenger" decals on the ATCs. Renee testified that she saw no warning label when she got onto the ATC. Counsel for Renee and for the Honda defendants alleged that the boys removed the labels, perhaps in order to "pretty up" the bike. Scott stated that he did remove the "Honda" labels but only because they were peeling off. William denied removing any labels, and the "Honda" decal was still on his ATC. Whether the decals were designed for durability is another factor to consider. In years subsequent to the sale of this ATC, Honda began embossing the warning directly onto the vehicle. The company also added a "hang tag" (so named because it hung from the

handlebars of the vehicle at the dealership) to convey warnings and safety information.

If the decal were indeed present on the ATC at some point, its effectiveness as a warning device was questionable due to content, appearance and placement. There was testimony, for example, that the decal was too small, that it should have been put in a conspicuous place rather than behind the seat where it was partially obscured by a rack, and that it should have conveyed the consequences of failing to heed the warning. The evidence was therefore legally sufficient to support the jury's answer to Question No. 4 concerning adequate warnings and instructions.

■ The next part of Question No. 4 asked whether the failure to give adequate warnings or instructions rendered the ATC unreasonably dangerous as marketed. Neither party to this appeal appears to address this in argument specifically. It would be an issue only if the jury's finding of inadequate warning were negated. The stipulated figures of injuries and deaths involving ATCs is evidence to support the jury's affirmative answer to this question. Surely the American public would not have purchased these vehicles had it been fully aware of the potential consequences of their use.

■ Renee next contests the jury's finding that the failure to give adequate warnings or instructions was a producing cause of the accident. Both William and his mother testified that had they been aware of the no passenger warning, they would not have allowed Renee to ride as a passenger. Thus, there was evidence establishing producing cause.

■ Renee also argues that William knew of the dangers posed by the ATC when a passenger was added and that this knowledge negates both the duty to warn and producing cause. She argues that the duty to warn, as well as the adequacy of the warning, must be evaluated in light of the user's knowledge or expertise. William testified only that he knew the ATC handled differently with a passenger. This is not tantamount to acknowledging that the

ATC should not carry passengers under any circumstances or that injury or death could result. Based on the evidence discussed above, points of error five, six and seven are overruled.

In the remaining points of error, Renee attacks the percentage reduction of her damage award. In point of error eight, she asserts that the trial court erred in overruling her motion to disregard the jury's answers to Questions Nos. 3, 4 and 5 because these issues were immaterial as a result of Mrs. Lipsey's election to take a dollar-for-dollar credit based on the Webster–Honda guaranty agreement. Point of error nine states that the trial court erred in construing the Webster–Honda guarantee agreement as a complete settlement between those parties as to Renee's products claims while at the same time giving effect to Question No. 5 (the comparative causation issue). In point of error ten, Renee argues that the trial court erred in failing to render judgment for her against Mrs. Lipsey for the entire amount of the jury's verdict.

■ Renee maintains that Mrs. Lipsey waived any right to a *Duncan* percentage set-off when, during objections to the charge, the following transpired:

COUNSEL FOR LIPSEYS: That's all, Your Honor. Well, further, Your Honor, one additional thing. We again reurge our motion that the Honda defendants, having settled completely with the plaintiff in this case, should not be permitted to participate in final argument and they should not be included in the Court's charge as defendants against whom recovery is being sought. And we make this objection because we do not believe that they were proper parties to the case, and if there's some interpretation or argument of the law made at some later point that by obtaining a defect finding we are denied our right to credit under the Comparative Negligent Statute, we are not waiving that at this time. And we ...

THE COURT: I think that's clear to me. You understand that your position is that it is as a settling joint tortfeasor, you're saying they have no right to continue their suit against the nonsettling nonparty.

Renee labels this "an express and irrevocable election of a credit." She further argues that the waiver of *Duncan* made this a negligence case which falls within the parameters of the comparative negligence statute, TEX.CIV.PRAC. & REM.CODE ANN. § 33.001 (Vernon 1986). Renee asserts, however, that even § 33.001 is foreclosed to Mrs. Lipsey because she failed to submit a negligence issue as to Honda.

Waiver is an intentional relinquishment of a known right. *Massachusetts Bonding and Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex 1967). As such, the waiver must be clear and unequivocal. *Nixon Constr. Co. v. Downs*, 441 S.W.2d 284, 286 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ). The above-quoted statement in no way clearly and unequivocally renounces Mrs. Lipsey's right to anything. As she points out in her brief, "[a] statement that a party does not waive a right is clearly not a waiver of that right or any other."

■ Renee next argues that the *Duncan* formula for comparing causation is not available to Mrs. Lipsey even if she did not waive her right to rely on it. She contends that for *Duncan* to apply, there must have been a viable defendant that the jury found to have been strictly liable. Once the Honda group settled its dispute with Renee, it was neither a proper nor viable party either as a plaintiff or a defendant. The remaining defendant was the allegedly negligent tortfeasor, and if there is to be a reduction of Renee's damages, the principles of § 33.001 must control. Renee maintains that this result necessarily follows the language in *Duncan*, and as she states in her brief:

We said below, and we say it again, the *Duncan II* comparative causation formula cannot be applied and was not intended to apply in favor of a purely negligent defendant, whether there has been a settlement with another party or not. It was only intended to provide a basis to reduce a strictly liable party's proportional liability; otherwise, the

manufacturer would have no way to reduce its liability to the injured user because it could not avail itself of 2212a.

The converse is not true! A negligent defendant can, by using 2212a, reduce its liability proportionally or take a dollar credit. It was this differential the Supreme Court was portending in *Simmons* and it was only this difference between strictly liable and negligently liable parties the Court addressed in *Duncan II;* nothing else.

This is not correct. *Duncan* did not distinguish between settling negligent defendants and settling strictly liable defendants. Where the court could have made this distinction, it instead used very general language such as the following:

> We hold that in multiple defendant cases in which grounds of recovery other than negligence are established, *the non-settling defendants'* liability and the plaintiff's recovery shall be reduced by the percent share of causation assigned to *the settling tortfeasor* by the trier of fact. (Emphasis added.)

665 S.W.2d at 429. And the following:

> Accordingly, we hold that a settlement with *one tortfeasor* will reduce the liability of *the non-settling defendants* by the percentage of causation allocated to *the settling tortfeasor* rather than by a pro rata share. *The term "tortfeasor" includes those whose liability is based on strict products liability, breach of warranty, and negligence.* (Emphasis added.)

*Id.* at 430.

Neither the cases which Renee cites in support of her argument nor her casting the Honda group as a nonviable party to the litigation is persuasive. Because of the settlement the Honda defendants actively participated in all phases of the trial. *See Stein v. American Residential Management, Inc.,* at 388 (the settling party has an incentive to assist plaintiff's case against other defendant because the contract provides for a reduction of the settling party's liability, the size of the reduction depending on size of total verdict: the more successful the settling defendant is in convincing jury to find for the plaintiffs, the less he will actually have to pay). In *Howard P. Foley v. Cox,* this court rejected the argument that the negligent defendants should be separated from the strictly liable defendants and that the liability of the negligent defendants should be apportioned under TEX.REV.CIV.STAT.ANN. art. 2212a (now § 33.001). 679 S.W.2d 58, 64 (Tex.App.—Houston [14th Dist.] 1984, no writ). In so doing, the court stated that *Duncan* foreclosed this type of damage allocation. *Id.* Renee asks this court to disregard the comparative causation finding and assess well over fifty percent of the damages against a party found to be five percent at fault. This is inappropriate. Points of error eight, nine and ten are overruled.

Both appeals are denied, and the judgment of the trial court is affirmed.