Reversed and Rendered in Part and Remanded in Part and
Opinion filed August 10, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00362-CV



Paul Moore, Appellant 

v.

Altra Energy
Technologies Inc., Altra Electronic Trading Services, Inc. and DGO, Inc. d/b/a
The Ownby Companies, Appellees 



On Appeal from
the 270th District Court

Harris County, Texas

Trial Court
Cause No. 2002-28914



 

OPINION 

This case was tried to a jury over allegations of
common-law and statutory fraud, promissory estoppel, and breach of contract. 
The jury returned a verdict of $4 million against appellant Paul Moore in favor
of appellees Altra Energy Technology, Inc., and Altra Electronic Trading
Services, Inc. (“Altra”), on Altra’s claim of common-law fraud.  The jury also
awarded Altra $1.25 million on its breach-of-contract claim against appellee DGO,
Inc., d/b/a The Ownby Companies (“DGO”).  And the jury awarded DGO $1.25
million in actual damages and $10 million in exemplary damages against Moore
for common-law and statutory fraud and promissory estoppel.  The trial court
reduced the exemplary award to $2.5 million pursuant to Texas Civil Practice
& Remedies Code section 41.008 and entered judgment on the verdict.  Moore
filed this appeal.

Moore’s complaints about the judgment include: (1)
the trial court erred by failing to realign the parties and properly allocate
peremptory strikes; (2) the evidence supporting Altra’s fraud claim is legally
and factually insufficient; (3) the evidence supporting DGO’s common-law and
statutory fraud claims is legally and factually insufficient; (4) the evidence
supporting DGO’s promissory-estoppel claim is legally and factually insufficient;
(5) the trial court erred by refusing to submit proportionate-responsibility
questions to the jury; and (6) the evidence supporting the jury’s punitive-damages
award to DGO is legally and factually insufficient.  We reverse the trial
court’s judgment, remand in part for further proceedings in accordance with
this opinion, and render in part a take-nothing judgment concerning Altra’s fraud
claim against Moore.   

I

Altra owned Chalkboard, which is a computer system used
to trade commodities on the internet.  In 2001, Altra began looking for a buyer
who would be interested in purchasing the Chalkboard assets through a stock
transaction.  David Ownby and his son Daniel Ownby had assisted in developing
the Chalkboard technology in the mid-1990s, and Altra contacted them about
purchasing it.  David’s company, DGO, hired attorney Richard Fuqua to raise
money to help fund the purchase as well as handle all the legal aspects of the transaction. 
Fuqua had worked with David on prior business agreements, and he brought in an
investor group including Tracy Turner, Moore, and Moore’s company, Maroon Bells
Capital, LLC.

During trial, the testimony from the witnesses about
the series of events leading up to the initiation of the lawsuit varied
greatly.  It is undisputed, however, that on November 15, 2001, Altra and DGO
signed an agreement concerning the terms of the proposed sale of Chalkboard. 
Altra agreed to negotiate exclusively with DGO until the closing date in
exchange for a $250,000 “Break-up Fee”; DGO would pay the fee if it did not
execute a final agreement by the closing date.  The original closing date was
December 13.  The agreement also required DGO to provide Altra with a
commitment letter that ensured a third party would fund the purchase.  

Fuqua, Turner, Moore, and David Ownby (“the Acquirers”)
engaged Frost Securities, Inc. (“Frost”), to evaluate the feasibility of
financing the Chalkboard sale.  On November 29, before Frost issued its
opinion, Altra and DGO agreed to amend the original agreement to increase the
purchase price and delete the closing-price-adjustment clause.  In a letter
dated November 30, Frost stated to the Acquirers:  “[W]e believe that this
Acquisition Transaction is financeable under a variety of financing plans. . .
. we are informed by the Acquirers that they have the ability themselves to
provide funding in the amount of the purchase price.”    

Altra employee Dixie Barrett testified that based on
the Frost letter, Altra amended the original agreement for the second time on
December 10 to extend the closing date to December 21 as well as eliminate the
exclusivity clause.  Although Barrett testified the letter was not “strong
enough” to be a true commitment letter, Altra claimed it relied on the letter in
continuing its discussions with DGO.  

David Ownby stated he proceeded with the discussions
because Moore continuously urged through his words and actions he was
interested in the transaction.  David testified that on December 20, before
DGO’s meeting with Altra, he called Moore to again discuss funding the
transaction.  According to David, Moore suggested “methods [by] which we could
continue the contract,” which included increasing the “Break-up Fee” to $1 million. 
Fuqua and David testified that during their meeting with Altra, they stepped
into the hall to call Moore about the transaction.  Fuqua stated he explained
the situation to Moore, and Moore said he would fund the deal.  So the parties
amended the agreement for a third time, increasing the “Break-up Fee” to $1
million, changing the closing date to January 31, and requiring DGO to
immediately pay $250,000 as a sign of good faith.  When Moore testified, however,
he denied ever telling David or Fuqua he would fund the transaction.  Moore
explained he was interested in the transaction, but after conducting his own due
diligence, he decided the deal was too risky; therefore, he never agreed to
fund anything.  

Fuqua wrote a check for $250,000 to Altra to cover
the good-faith fee, and he testified Moore had agreed to wire him $250,000 to
cover the amount of the check.  Fuqua testified Moore never sent or wired Fuqua
any money.  The check was returned for insufficient funds.  Fuqua stated he tried
to tender the check for the second time, but it was returned again due to
insufficient funds.  DGO failed to close the sale by the closing date, and in
June 2002, Altra sued David and Daniel Ownby, Fuqua, Fuqua’s law firm, and DGO
based on a number of claims.  Subsequently, Altra added Maroon Bells and Moore
to the lawsuit.  DGO and Fuqua brought third-party actions against Moore and
Maroon Bells.  

Before the trial, the court dismissed with prejudice Altra’s
claims against David Ownby and the Fuqua defendants, but Altra continued to
pursue its claims against DGO, Moore, and Maroon Bells.  The claims at issue
during the trial included Altra’s breach-of-contract claim against DGO, Altra’s
common-law fraud claim against Moore, DGO’s common-law fraud claim against
Moore, DGO’s statutory-fraud claim against Moore, and DGO’s promissory-estoppel
claim against Moore.  After hearing all the evidence, the jury returned a
verdict against Moore for $4 million in actual damages in favor of Altra, for
$1.25 million in actual damages in favor of DGO, and for $10 million in
punitive damages in favor of DGO.  The trial court reduced the punitive damages
to $2.5 million.  Moore timely filed a motion for new trial, but the trial
court denied it.  This appeal followed.

II

Altra’s Fraud Claims

Moore’s initial issue concerns the trial court’s
failure to realign the parties or equalize peremptory strikes.  But, because
they are potentially dispositive of the appeal, we will first address Moore’s
legal-sufficiency issues.  In his second issue on appeal, Moore contends the
evidence supporting Altra’s fraud claim is legally insufficient to support the
jury’s verdict.  In evaluating legal sufficiency of the evidence, we view all
evidence in the light most favorable to the challenged finding and appealed
order and indulge every reasonable inference that would support it.  City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005); Harris County v.
Vernagallo, 181 S.W.3d 17, 24 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  We must credit favorable evidence if a reasonable fact finder could,
and disregard contrary evidence unless a reasonable fact finder could not.  City
of Keller, 168 S.W.3d at 827; O & B Farms, Inc. v. Black, 300
S.W.3d 418, 420 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).  The fact
finder is the only judge of the witnesses’ credibility and the weight to give
to their testimony.  City of Keller, 168 S.W.3d at 819; Vernagallo,
181 S.W.3d at 24.   

We may sustain a no-evidence contention only if the
record reflects one of the following: (1) the complete absence of a vital fact;
(2) the evidence offered to prove a vital fact is not more than a scintilla;
(3) a rule of law or of evidence bars the court from giving weight to the only
evidence offered to prove a vital fact; or (4) the evidence conclusively
established the opposite of the vital fact.  City of Keller, 168 S.W.3d
at 810; Prairie View A&M Univ. v. Brooks, 180 S.W.3d 694, 705 (Tex.
App.—Houston [14th Dist.] 2005, no pet.).  The evidence constitutes no evidence
when the evidence offered to prove a vital fact is so weak as to do nothing
more than create a mere suspicion or surmise of its existence; hence, the
evidence is no more than a scintilla.  See Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 601 (Tex. 2004).  More than a scintilla of evidence exists when
the evidence rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions as to the existence of the vital fact.  Id. 
In other words, the evidence is legally sufficient if it would enable
reasonable and fair-minded people to reach the decision under review.  City
of Keller, 168 S.W.3d at 827–28; Vernagallo, 181 S.W.3d at 24.   

Moore argues the evidence supporting Altra’s fraud
claim is legally insufficient.  He contends the Frost letter, which Altra
asserted in its pleadings as the basis for its fraud claim, is comprised not of
any representation he made, but only the opinions of Frost—a third party.  Moore
also complains there is no evidence of any other false representation, or of
Altra’s reliance on the letter, or of any injury Altra suffered.  Moore argues
the Frost letter even contains a disclaimer of reliance by third parties
without consent from Frost, which Frost never gave.  Altra counters by
emphasizing that taken together, the Frost letter and Moore’s testimony
indicate Moore knew Altra would rely on his representation that he could fund
the deal.  Additionally, in its brief, Altra contends it relied on the false statements
that Moore made to DGO.  Altra argues Moore knew or should have known his
statements to DGO would be repeated to Altra and Altra would rely on those
statements.  

We must first review what Altra pleaded and tried in
relation to its fraud claim.

In Altra’s
live petition, it provides:

[Moore] caused [Frost] to
issue a letter dated November 30, 2001 which stated that the proposed
transaction was financeable and the Acquirers had the ability to provide
funding in the amount of the purchase price. [Moore] made these representations
with the intent to induce [Altra] to forebear the opportunity to enter into
negotiations with other third parties interested in the purchase of the electronic
trading business.

It
is clear from Altra’s pleadings that it did not base its fraud claim on Moore’s
alleged misrepresentations to DGO.  But issues not raised in pleadings can be
tried by express or implied consent of the parties, and the issues will be
treated as if they had been raised in the party’s pleadings.  Tex. R. Civ. P.
67; Pickelner v. Adler, 229 S.W.3d 516, 523 (Tex. App.—Houston [1st
Dist.] 2007, pet. denied); see also Herrington v. Sandcastle Condo. Ass’n,
222 S.W.3d 99, 102 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating that
a trial court cannot enter judgment on a theory of the case that was not
pleaded or tried by consent).  This rule “applies only where it appears from
the record that the issue was actually tried, although not pleaded.”  Johnston
v. McKinney Am., Inc., 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.]
1999, pet. denied); see also RE/MAX of Tex., Inc. v. Katar Corp., 961
S.W.2d 324, 328 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (“Trial by
consent is intended to cover the exceptional case where it clearly appears from
the record as a whole that the parties tried the unplead issue. . . . It is not
intended to establish a general rule of practice . . . and in no event in a
doubtful situation.”).  

            To determine whether an unpleaded issue was tried by consent, we
examine the record not for evidence of the issue, but rather for evidence of trial of the
issue.  Haas v. Ashford Hollow Cmty.
Improvement Ass’n, Inc., 209 S.W.3d 875,
883–84 (Tex. App.—Houston [14th Dist.] 2006, no pet.); McKinney
Am., Inc., 9 S.W.3d at 281.  A party’s unpleaded issue may be deemed tried by consent when
evidence on the issue is developed under circumstances indicating both parties
understood the issue was in the case, and the other party failed to make an
appropriate complaint.  Haas, 209 S.W.3d at 884; Johnson v.
Structured Asset Servs., LLC, 148 S.W.3d 711, 719 (Tex. App.—Dallas
2004, no pet.); see La Marque Indep. Sch. Dist. v. Thompson, 580 S.W.2d
670, 673 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ).  Trial by consent
is not applicable when evidence relevant to an unpleaded issue is also relevant
to a pleaded issue because admitting that evidence would not elicit an
objection; therefore, its admission would not prove the parties’ “clear intent”
to try the unpleaded issue.  In re T.S., No. 14-05-00348-CV, 2006 WL
1642218, at *6 (Tex. App.—Houston [14th Dist.] June 15, 2006, no pet.) (mem.
op.); Case Corp. v. Hi-Class Bus. Sys. of Am., 184 S.W.3d 760, 771 (Tex.
App.—Dallas 2005, pet. denied).  

At
the outset of the trial, during jury selection, Moore moved to align Altra and
DGO.  While considering the motion, the trial court asked Altra’s attorney what
made Altra’s case factually diverse from DGO’s.  Altra’s counsel responded,
“We’re adverse on the breach of contract No. 1.  No. 2, our fraud theory is
based upon a letter.”  The trial court then replied, “I hear you.  And I
understand you, but the inquiry is a step beyond where you’re talking.  The
inquiry is if we agree on the facts and you think it’s a breach and he doesn’t
then that’s no factual adversity.”  Altra’s counsel then stated:

On [its] fraud theory he
claims – D.G.O. claims that [Moore] said he would fund the deal.  On our fraud
theory we claim that [Moore] gave information to a bank that the deal was
financeable and – could fund the deal themselves, which was a
misrepresentation, false misrepresentation that we relied on and went forward
with the deal so fraud, the deal is completely separate.  

Thus, as trial was getting
underway, Altra informed the trial court that its fraud claim against Moore was
based solely on the Frost letter.  Altra’s statements to the court were
consistent with its pleadings.  

Furthermore, in Altra’s opening statement, it claimed
it relied on the Frost letter to its detriment.  Even though Altra’s attorney
also discussed Moore’s oral representations to DGO, Altra expressly stated it
learned about all of Moore’s representations to DGO after it initiated the
lawsuit.  With regard to Moore’s oral statements, Altra seemed to frame its
discussion around what led DGO to sign the contract with Altra, not what led
Altra to sign the contract with DGO.  More importantly, throughout its opening
statement, Altra focused its own fraud argument on the November 30 Frost letter. 
Specifically, when Altra’s attorney was summarizing Altra’s claims against
Moore, he stated, “We also believe that there will be evidence [Moore] participated
in the creation of that November 30, 2001 letter that Altra relied on to its
detriment and that was a false statement in that letter according to [Moore]
and we were harmed to the tune of $4 million.”

Much later, during the charge conference, Moore’s
counsel objected to Altra’s proposed fraud question.  Moore’s counsel argued
there was no evidence of any of the elements of fraud.  He then stated, “We
also believe as a matter of law Altra could not have relied on the November
30th false securities financial billing letter which is the basis for the fraud
claim because that letter expressly disclaims reliance.”  Altra’s counsel did
not dispute Moore’s statement that the Frost letter was the basis for Altra’s
fraud claim.  From Moore’s arguments to the court, it appears as if he believed
Altra’s claim was based only on the representations in the letter; this
indicates he did not believe Altra was pursuing two theories of fraud as it
tried the case.  See Haas, 209 S.W.3d at 884 (holding both parties must
understand the issue was being tried in the case).  

            After reviewing
the record, we cannot conclude the parties tried by consent a theory of fraud
based on Altra’s reliance on representations Moore made to DGO.  It is true that
Moore never objected to Altra’s supposed pursuit of a fraud theory not included
in its pleadings.  But it makes sense that Moore would see no reason to object
to evidence supporting such a theory, because DGO’s properly pleaded fraud case
consisted of that very evidence.  See cf. Case Corp., 184 S.W.3d
at 772 (concluding the evidence of the parties’ unpleaded claim was relevant to
the parties’ pleaded claims; hence, the evidence was not developed under
circumstances demonstrating both parties understood the issue); Purselley
Indus., Inc. v. C.B. Engle, 717 S.W.2d 662, 665 (Tex. App.—Tyler 1986, writ
ref’d n.r.e.) (holding “the evidence that established that defensive theory
conclusively was also admissible under other pleadings in the case not related
to the ‘alter ego’ doctrine”; therefore, the theory could not be tried by
consent).  Furthermore, the record shows Moore never understood Altra had two
theories of fraud.  Absent pleading or trial by consent, the trial court could
not have granted Altra relief based on any representations Moore made to DGO;
the court could have only granted relief for fraud based on the Frost letter.  See
Moneyhon v. Moneyhon, 278 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.]
2009, no pet.).  In conducting our legal-sufficiency analysis, we will review
Altra’s fraud claim only with regard to the Frost letter.

The jury affirmatively answered that Moore committed
common-law fraud against Altra.  Question 3 instructed the jury on the
following elements of common-law fraud: 

(1) [a] party makes a material misrepresentation; (2) [t]he
misrepresentation is made with knowledge of its falsity or made recklessly
without any knowledge of the truth and as a positive assertion; (3) [t]he
misrepresentation is made with the intention that it should be acted on by the
other party; and (4) [t]he other party relies on the misrepresentation and
thereby suffers injury.  

The term misrepresentation
“means a false statement of fact.”  Thus, to prevail on its fraud claim, Altra needed
to prove: (1) Moore made a material representation that was false; (2) he knew
the representation was false or he made it recklessly as a positive assertion
without any knowledge of its truth; (3) he intended to induce Altra to act upon
the representation; and (4) Altra actually and justifiably relied upon the
representation and suffered injury.  See Ernst & Young, L.L.P. v. Pac.
Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001); Burroughs v. APS
Int’l, Ltd., 93 S.W.3d 155, 161 (Tex. App.—Houston [14th Dist.] 2002, pet.
denied).

Altra relies on the Texas Supreme Court’s decision in
Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co. for the
proposition that misrepresentations Moore made to Frost with the expectation
that Frost would repeat the statements to Altra may form the basis of Altra’s
fraud claim against Moore.  In Ernst & Young, an accounting firm audited
a bank’s financial statements, and the firm gave an unqualified opinion or
report about those statements.  51 S.W.3d at 575.  The bank incorporated the
auditing report in its annual report and Form 10-K that it filed with the
Security and Exchange Commission.  Id.  In soliciting its shareholders
to approve a merger, the bank issued three prospectuses, which all contained
the Form 10-K, the bank’s financial statements, and the accounting firm’s auditing
report.  Id. at 575–76.  An investor, in reliance on all of the bank’s public
information and prospectuses, bought notes from the bank.  Id. at 576.  But
shortly after the investor completed the transaction, the bank filed for
bankruptcy.  Id.  The investor filed suit, alleging the accounting firm knowingly
or recklessly made material misrepresentations about the financial health of
the bank and the firm intended for investors to rely on the misrepresentation. 
Id.  In ruling for the investor, the supreme court held a direct
relationship does not have to exist between the fraudfeasor and the object of
his deception.  Id. at 578–80.      

Based on Ernst & Young, Altra argues a
defendant can “commit fraud indirectly when [he] makes a false representation
to a third party with the intent or expectation that it be repeated to deceive
the plaintiff.”  See id. at 578–80.  In relying on Ernst & Young,
this court has previously concluded a person who makes a false
representation may be liable to a third person, to whom the misrepresentation
was not directly made, if the person making the misrepresentation had the
intent or knowledge that it should be repeated to a third person and intended
or knew the third person would act in reliance on the misrepresentation.  Burroughs,
93 S.W.3d at 162.  Thus, a misrepresentation made through an intermediary is
actionable if it is intended to influence a third person’s conduct.  Ernst
& Young, 51 S.W.3d at 578.  

            The November 30
letter was signed by William C. Collins, Frost’s managing director.  Via his
deposition, Collins testified at trial that Frost issued the letter to provide
certain opinions about the financeability of the Chalkboard transaction.  Collins
stated it was Frost’s opinion that the Acquirers had the ability to fund the
amount of the purchase price, and Frost reached that opinion based on
information from Turner and Moore.  Altra’s attorney asked Collins, “What
information do you remember getting from either [Turner] or [Moore] that the
acquisition was financeable under a variety of financing plans?”  Collins
responded: 

Well, we looked at --
as we discussed in the financeability letter, we looked at a sort of financing
position of the target, and we -- you know, at the time -- which was -- also
energy trading was an extremely attractive area for certain investors and
financing sources that that’s what -- and that’s how we came up with that
opinion.

Although Collins stated Frost
reached its opinion based on information Moore provided, Collins also testified
Frost made its decision by combining Moore’s information with other sources.  Altra’s
attorney asked Collins, “Did you rely on the information received from Tracy
Turner and Paul Moore in order to give truthful representations in the
financeability letter which is Exhibit No. 2?”  Collins responded, “Yes, but
not -- not absolutely, not in -- just only that information.  It was also the
information we received on the income statements and the balance sheet, to look
at the true -- you know, to look at the financial status of the operations; and
that coupled with our experience in the market -- and especially in the market
at the time.”[1] 


This case is simply not on the same footing as Ernst
& Young.  In Ernst & Young, the plaintiff relied on the opinion
of the alleged fraudfeasor—the accounting firm—which was passed to the
plaintiff through a third party—the bank.  51 S.W.3d at 575–76.  In this case,
Altra purports to rely on the opinion of Frost—a third party.  And there is no
evidence Frost’s opinion was based on any misrepresentation to Frost by Moore. 
The record is simply devoid of any misrepresentation by Moore contained in
either the Frost letter itself or the information Moore allegedly provided
Frost for the purpose of preparing the letter.  

Besides, Altra’s complaint is that Moore
misrepresented his willingness to fund the deal.  The Frost letter
offers no opinion about willingness or intent, but merely about Moore’s ability
to fund the deal.[2] 
Because there is a complete absence of a vital fact—a misrepresentation from
Moore—and the evidence offered in an effort to prove the vital fact is less
than a scintilla, we conclude the evidence supporting Altra’s fraud claim
against Moore is legally insufficient.  See City of Keller, 168
S.W.3d at 810; See Ford Motor Co., 135 S.W.3d at 601.  Accordingly, we
sustain Moore’s second issue, and render a judgment that Altra take nothing by
way of its fraud claims against Moore.

DGO’s Fraud Claims

 

Moore also challenges the legal sufficiency of the
evidence relating to DGO’s fraud claims.[3] 
Moore argues the jury’s common-law-fraud finding cannot withstand a legal-sufficiency
analysis because he never made a false statement to DGO, he never intentionally
or recklessly misrepresented his intention to finance the sale, and DGO never
reasonably relied on Moore’s alleged representation.  Moore asserts the only
evidence that Moore made statements to DGO concerning financing the transaction
was his alleged statements to Fuqua.  He claims even if he made those
statements, DGO did not prove he intended to actually finance the deal. 
Additionally, he argues DGO did not reasonable rely on his alleged statements
because he never spoke with either David or Daniel Ownby, and he never signed
any documentation about the transaction.  DGO contends, however, that the
evidence at trial demonstrated that Moore made several misrepresentations to both
DGO and Fuqua.  

The common-law-fraud question submitted to the jury
is the same as the question submitted to the jury for Altra’s fraud claim
against Moore, except for the definition of misrepresentation.  For DGO’s fraud
question, “misrepresentation” is defined as “a promise of future performance
made with an intent, at the time the promise was made, not to perform as
promised.”  The jury affirmatively answered that Moore committed fraud against
DGO.   

“A promise of future performance constitutes an
actionable misrepresentation if the promise was made with no intention of
performing at the time it was made.”  Formosa Plastics Corp. USA v. Presidio
Eng’rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).  Proving
that a party did not intend to perform “is not easy, as intent to defraud is
not usually susceptible to direct proof.”  Tony Gullo Motors I, L.P. v.
Chapa, 212 S.W.3d 299, 305 (Tex. 2006); see also Aquaplex, Inc.
v. Rancho La Valencia, Inc., 297 S.W.3d 768, 74–75 (Tex. 2009) (per curiam). 
But intent is a question for the fact finder because it depends on the
witnesses’ credibility and the weight given to their testimony.  Spoljaric
v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986).  The fact that
the party did not perform does not alone indicate the party did not intend to
perform when the promise was made.  Id. at 435.  Often intent is derived
from “[s]light circumstantial evidence of fraud.”  Id.  Additionally,
although a party’s intent is determined at the time of the representation, the
intent may be inferred from a party’s acts after the promise is made.  Id. 
Hence, one piece of circumstantial evidence is a party’s denial he ever made a
promise.  Id.  

Multiple witnesses, including Turner, Moore’s only
witness, testified Moore gave the impression he was very interested in the
transaction, even after he first discussed the deal with David Ownby.  There
was testimony at trial that Moore visited Altra’s facilities to inspect the Chalkboard
operations.  Daniel Ownby testified Moore continued to request information
about Altra into late 2001.  Daniel also stated Moore requested that his
“financial guy” review everything to make sure the deal was sound.  Daniel
testified DGO would not have gone forward with the deal with Altra unless DGO
believed it had a deal with Moore.  He stated, “We signed Amendment 3 to keep
the deal going based on the assurance that [Moore] gave us.”  David Ownby
stated he signed the original agreement and the third amendment because Moore
continuously expressed his interest and even suggested ways to continue the
contract.  Like his son, David Ownby testified he relied on Moore’s
representations, and he would not have signed the deal under any other
circumstances.   

Fuqua also testified David signed the agreement with
Altra because David understood there was going to be financing for the deal
from Moore.  During Fuqua and David’s meeting with Altra, they both testified
they stepped into the hall to call Moore about the transaction.  Fuqua stated
he called Moore to explain the situation, and he said, “You know, we’re at a
point in time where Altra is demanding we sign, we don’t have the money, we
need the money from you before we can sign . . . we’re not going to sign unless
we have the money.”  Fuqua testified Moore then said, “Tell David to sign the
document . . . I will fund the deal.”  After Moore did not deliver the funds,
Fuqua stated he asked Larry Ramming, a mutual business associate of Moore and
Fuqua, to call Moore and put the call through to Fuqua.  Fuqua testified he
contacted Moore three times, and each time Moore reaffirmed he was going
forward with the deal.  According to Fuqua, Moore told him, “This deal will be
done . . . the money will flow, I’ll get this done.”  Additionally, when
Ramming testified, he stated he overheard the phone conversation between Fuqua
and Moore in which Moore said he would fund the money for the Altra deal.  When
questioned at trial, Moore stated he never intended to fund the entire deal,
but he also testified he never expressed this sentiment to DGO or its
representatives.

DGO also points to the Frost letter as evidence that
Moore was interested in financing the transaction as well as evidence that
Moore had reason to expect DGO would act in reliance on the representation
because DGO was named as one of the Acquirers in the letter.  See Ernst
& Young, 51 S.W.3d at 580 (concluding “the reason-to-expect standard
requires more than mere foreseeability; the claimant’s reliance must be
‘especially likely’ and justifiable, and the transaction sued upon must be the
type the defendant contemplated”).  

In his brief, Moore states the trial testimony
reflected “an old fashioned swearing match.” Throughout Moore’s testimony, he
denied all the allegations against him and denounced the testimony from Altra’s
witnesses as completely false.  But in evaluating the legal sufficiency of the
evidence, we view all evidence in the light most favorable to the challenged
finding and indulge every reasonable inference that would support it.  City
of Keller, 168 S.W.3d at 822.  Additionally, we do not step into the shoes
of the fact finder because the fact finder is the only judge of the witnesses’
credibility.  See id. at 819; Texoma Adver. Co., L.P. v.
Siblings, L.L.C., No. 14-08-00602-CV, 2009 WL 1660619, at *5 (Tex.
App.—Houston [14th Dist.] June 16, 2009, no pet.) (mem. op.).  It is the fact
finder’s responsibility to weigh the hotly contested evidence, and although the
testimony differs, we will not second-guess the jury’s credibility assessment
or the weight the jury gives the witnesses’ testimony.  

Here, there is more than a scintilla of evidence that
would enable reasonable and fair-minded people to differ in their conclusions
as to the existence of a vital fact.  See Ford Motor Co., 135 S.W.3d at
601.  The evidence summarized above, when viewed in the light most favorable to
the challenged finding, is legally sufficient to support the trial court’s
judgment in this case.  See City of Keller, 168 S.W.3d at 827.  Because
we conclude there is legally sufficient evidence to support DGO’s common-law
claim, we will not address Moore’s complaint about DGO’s statutory claim.[4] 
Accordingly, we overrule Moore’s third and fourth issues.

DGO’s Promissory-Estoppel Claim

Moore argues DGO’s promissory-estoppel claim fails
for the same reasons as DGO’s fraud claims—the evidence is legally insufficient
to prove Moore “promised” to fund the transaction or that DGO reasonable could
rely on any alleged promise.  DGO contends Moore, through his actions and
words, promised to pay the break-up fee and fund the transaction.  Furthermore,
DGO argues Moore’s significant interest in the transaction and promise to “fund
the deal” led DGO to reasonably rely on Moore’s promise.      

In the jury charge, Question 4 inquired, “Did DGO,
Inc. substantially rely to its detriment on Paul Moore’s promise to fund, if
any, and was this reliance foreseeable by Paul Moore?”  The jury affirmatively
answered that Moore made promises to DGO, and it was reasonable for DGO to rely
on these promises.  Thus, to prevail on its promissory-estoppel claim, DGO had
to prove: (1) Moore made a promise to DGO; (2) DGO reasonably relied on the
promise to its detriment; and (3) DGO’s reliance was foreseeable by Moore.[5]  See English
v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983); Sandel v. ATP Oil & Gas
Corp., 243 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2007, no
pet.).      

The abovementioned common-law-fraud evidence is the
same evidence DGO used to prove its promissory-estoppel claim.  Like the first
and last elements of fraud, the jury found Moore informed DGO it would fund the
deal with Altra, and DGO reasonably relied on this promise.  Again, although
the witnesses’ stories differ, it is the fact finder who judges their
credibility.  See City of Keller, 168 S.W.3d at 819; Texoma
Adver. Co., L.P., 2009 WL 160619, at *5.  Based on the analysis above, when
viewed in the light most favorable to the challenged finding, we conclude the
evidence supporting DGO’s promissory-estoppel claim is legally sufficient to
support the verdict.  See City of Keller, 168 S.W.3d at 827.  Thus,
we overrule Moore’s fifth issue.       

III

Having
addressed Moore’s legal-sufficiency arguments, we now return to his primary
complaint.  In his first issue, Moore complains the trial judge erred because
he neither realigned the parties nor equalized the peremptory strikes between
the sides.  Specifically, Moore contends Altra and DGO were not antagonistic;
therefore, they should have been aligned on the same side and together given
the same number of peremptory strikes as Moore.  Second, Moore complains even
if Altra and DGO were antagonistic, the trial court abused its discretion by
failing to align them because the degree of antagonism was minimal.  Finally,
Moore argues if we conclude an error occurred in failing to align the parties
or in apportioning the strikes, reversal is required because the error caused
the trial to be materially unfair.  Both Altra and DGO contend they are not
aligned because Altra’s active pursuit of its breach-of-contract claim against
DGO clearly demonstrates the antagonism between them.  Additionally, during
voir dire, Altra argued its fraud claim against Moore differed from DGO’s fraud
claim against Moore; therefore, the parties were factually adverse.    

Generally,
each party in a civil action in district court is entitled to six peremptory
strikes.  Tex. R. Civ. P. 233.  But in a multiparty case, before allocating
peremptory challenges, it is the trial court’s duty to decide whether any of
the litigants aligned on the same side of the docket are antagonistic with
respect to any issue submitted to the jury.  Id.; Garcia v. Cent.
Power & Light Co., 704 S.W.2d 734, 736 (Tex. 1986); Van Allen v.
Blackledge, 35 S.W.3d 61, 64 (Tex. App.—Houston [14th Dist.] 2000, pet.
denied).  The term “side” “is not synonymous with ‘party,’ ‘litigant,’ or
‘person.’  Rather ‘side’ means “one or more litigants who have common interests
on the matters with which the jury is concerned.”  Tex. R. Civ. P. 233; Patterson
Dental Co. v. Dunn, 592 S.W.2d 914, 917 (Tex. 1979).  If there is no
antagonism between litigants on the same side, then each side must receive the
same number of strikes.  Garcia, 704 S.W.2d at 736.  

            Whether
antagonism exists is a question of law for the trial court.  Garcia, 704
S.W.2d at 736.  We review questions of law de novo.  See El Paso Natural Gas
Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 312 (Tex. 1999).  In
reviewing antagonism, the Texas Supreme Court has concluded that the pleadings
alone are not the only factor for courts to consider.  Garcia, 704
S.W.2d at 736–37; Dunn, 592 S.W.2d at 919.  To determine if antagonism
exists, the trial court must also consider information disclosed by pre-trial
discovery, information and representations made during voir dire, and any other
information brought to the attention of the trial court before the parties
exercise their peremptory strikes.  Id. at 737; see Scurlock Oil Co.
v. Smithwick, 724 S.W.2d 1, 5 (Tex. 1986) (op. on reh’g).  Although parties
may have cross-claims or other causes of action against each other, other
information brought to the trial court’s attention can overcome any antagonism evinced
in the pleadings.  Garcia, 704 S.W.2d at 737.  The trial court’s
antagonism ruling must occur before the exercise of peremptory strikes, but
after the litigants complete voir dire.   Id. at 737; Dunn, 592
S.W.2d at 919.  

            It
is also the trial court’s duty, after a litigant’s timely motion, to equalize
the number of peremptory strikes so that any litigant or side is not given an
unfair advantage as a result of the alignment and number of peremptory
challenges.[6] 
Tex. R. Civ. P. 233; Van Allen, 35 S.W.3d at 64.  The nature and degree
of the antagonism, and its effect on the number of strikes allocated to each
side or litigant, are matters left to the trial court’s discretion.  Webster
v. Lipsey, 787 S.W.2d 631, 638 (Tex. App.—Houston [14th Dist.] 1990, writ
denied).  We review and consider only the information the trial court knew at
the time it allocated the peremptory strikes to decide whether the trial court
abused its discretion.  Am. Cyanamid Co. v. Frankson, 732 S.W.2d 648,
653 (Tex. App.—Corpus Christi 1987, writ ref’d n.r.e.).  A trial court does not
abuse its discretion if its decision is based on a reasonable assessment at the
time the challenges were made.  Id. at 661 (op. on reh’g).  But if the
trial court ignored the parties’ posture, or overlooked or misconstrued a vital
factor, then its decision should be reversed as an abuse of discretion.  Id. 
The goal is not to give each side exactly the same number of strikes, but to
prevent one side, comprised of parties who are adverse on certain factual
matters yet united against the other side generally, from controlling jury
selection.  See Dunn, 592 S.W.2d at 920.  The Texas Supreme Court
has concluded “in most cases a two-to-one disparity between sides would
approach the maximum disparity allowable. . . . [When] the disparity between
strikes allowed the two sides did not exceed a two-to-one ratio, courts have
held that there was no abuse of discretion.”  Id. 

            If
the trial court errs, we must determine whether the error resulted in a trial
that was materially unfair.  Garcia, 704 S.W.2d at 737; Dunn, 592
S.W.2d at 920.  We must examine the entire record during the harm analysis. Garcia,
704 S.W.2d at 737; Dunn, 592 S.W.2d at 920.  Courts have concluded that
if the parties have collaborated on the exercise of peremptory strikes such that
no double strikes are made, this is some evidence that the parties have used
their positions unfairly.  Lopez v. Foremost Paving, Inc., 709 S.W.2d
643, 645 (Tex. 1986); see Van Allen, 35 S.W.3d at 65. 
Additionally, when the trial is hotly contested and the evidence is sharply
conflicting,[7]
the error from an improper allocation of peremptory challenges results in a
materially unfair trial without showing more.  Garcia, 704 S.W.2d at
737; Dunn, 592 S.W.2d at 920; Van Allen, 35 S.W.3d at 66.    

In
its brief, Altra contends there is antagonism because the pleadings demonstrate
it had a claim against DGO, the claim was submitted to the jury, and Altra
questioned the jurors only about its claims against DGO and Moore.[8]  DGO
specifically contends the pleadings indicate there is antagonism between itself
and Altra, the issue was submitted to the jury, and there was a common strike
between DGO and Altra.[9] 
Additionally, during oral argument, Altra and DGO argued antagonism can be
gleaned from the fact there was an ongoing dispute about attorney’s fees
between Altra and DGO, Altra still had the burden to prove DGO breached the
contract, in its pleadings DGO asserted affirmative defenses against Altra’s
breach-of-contract claim, and there is a judgment against DGO relating to
Altra’s breach-of-contract claim.  Moore acknowledges Altra’s
breach-of-contract claim against DGO, but he complains Altra and DGO joined
together “to blame Moore for their failure to close the sale from Altra to
DGO.”  Moore points this court to the voir-dire testimony and information known
to the trial judge before the parties exercised their strikes to show how Altra
and DGO were not antagonistic but aligned on the same side.[10] 

Moore
relies on Diamond Shamrock Corp. v. Wendt for the proposition that when the
trial court misallocates the number of peremptory strikes, one side can acquire
an “unfair advantage.”  718 S.W.2d 766, 770 (Tex. App.—Corpus Christi 1986,
writ ref’d n.r.e.).  In Diamond Shamrock, Wendt’s prized bull, “Superman
1024,” died on Medina Valley A.I. Laboratory’s premises after Medina’s
employees injected it with a Diamond Shamrock-manufactured insecticide.  Id.
at 767.  Wendt then sued Medina and Diamond Shamrock and received a judgment
against both parties.  Id.  At trial, the trial court refused Diamond
Shamrock’s request that Wendt and Medina be aligned on the same side, and
instead allocated twelve peremptory strikes to Wendt and six each to Diamond
Shamrock and Medina.  Id. at 768.  On appeal, Diamond Shamrock
complained Wendt and Medina should have been aligned and together received the
same number of peremptory strikes as it did.  Id. at 768.  The Corpus
Christi court of appeals examined the voir-dire testimony to determine if there
was any antagonism between Wendt and Medina.  Id. at 768–69.  

The
court noted Wendt and Medina had an apparent common interest, which was to
blame Diamond Shamrock for the bull’s death.  Id. at 769.  When Wendt
discussed gross negligence and punitive damages with the venire panel, it
mentioned only Diamond Shamrock and not Medina.  Id.  Wendt and Medina’s
common theme throughout the voir dire was that Diamond Shamrock’s chemical
killed Superman.  Id.  Diamond Shamrock, meanwhile, blamed Medina.  Id. 
Both Medina and Diamond Shamrock conceded Wendt was not responsible, and
neither contended he should not be compensated.  Id. at 768, 769.  Medina
never expressly denied negligence, but it did question the venire about
requiring Diamond Shamrock and Wendt to prove negligence.  Id. at 769.  

The
Corpus Christi court held “the trial court did not err in failing to align
Medina and Wendt on the same side.”  Id. at 769.  It did so after noting
there was “no settlement between any of the parties,”[11] and the
plaintiff “was actively seeking recovery against both defendants.”  Id. 
But the court determined that “[t]he number of peremptory challenges allotted
to each litigant presents a different problem.”  Id. at 770.  Allocating
“twelve strikes to Wendt, six to Medina, whose interests were so closely
identified with Wendt’s and only six to [Diamond] Shamrock resulted in an
unfair advantage to Wendt,” and amounted to an abuse of the trial court’s
discretion.  Id.[12] 


Unlike
some of our sister courts, this court has decided few cases concerning
antagonism and realignment.  See, e.g., Van Allen, 35 S.W.3d at
64–65; Webster v. Lipsey, 787 S.W.2d at 638–39; Williams v. Tex. City
Refining, Inc., 617 S.W.2d 823, 826–27 (Tex. App.—Houston [14th Dist.]
1981, writ ref’d n.r.e.).  Our most analogous analysis of antagonism is Webster
v. Lipsey.  In that case, Renee Webster was injured in an accident involving
a Honda ATC driven by William Lipsey.  787 S.W.2d at 634.  Webster sued
Lipsey’s mother and Honda. Id.  Honda joined Lipsey as a third-party
defendant.  Id.  Before trial, Webster and Honda entered into a
settlement to limit Webster’s recovery from Honda to $7.5 million.  Id.
at 635.  On appeal, Lipsey’s mother argued that the trial court should have
aligned Webster with Honda because of their common cause of action against the
Lipseys or the trial court should have properly allocated the peremptory
strikes.  Id. at 638.    Despite the settlement, this court held there
was sufficient antagonism between Webster and Honda because during voir dire,
Webster’s attorney discussed the product defect with the venire, and Honda
expressly stated it was resisting any defect finding.  Id. at 639. 
Additionally, we noted the defective-design issue was submitted to the jury.[13]  Id.


            Here,
it is undisputed that Altra had a claim against DGO for breach of contract. But
as the Texas Supreme Court emphasized in Garcia v. Central Power & Light
Co.,  we must consider not only the pleadings, but also information
disclosed by pre-trial discovery, information and representations made during
voir dire, and any other information brought to the attention of the trial
court before the parties exercise their peremptory strikes.  See 704
S.W.2d at 737.  As demonstrated in both Lipsey and Diamond Shamrock,
courts often review the information and representations the parties make during
voir dire.  See Lipsey, 787 S.W.2d at 638–39; Diamond Shamrock
Corp., 718 S.W.2d at 768–69; see also Frankson, 732 S.W.2d
at 652 (discussing the parties’ statements made during voir dire as well as the
direction of their voir-dire examinations); Frank B. Hall & Co. v.
Beach, Inc., 733 S.W.2d 251, 256–57 (Tex. App.—Corpus Christi 1987, writ
ref’d n.r.e.) (discussing the information provided in the pre-trial hearing and
voir dire).  Moore argued in both his brief and during voir dire, however, that
the trial court should also review the parties’ pre-trial filings.  Indeed, a
review of the pre-trial information in this case reveals several similarities indicating
a lack of antagonism between Altra and DGO.  

First,
Altra and DGO have virtually identical witness lists; the only exception is
that DGO included its attorney on its list.  Second, in Altra’s proposed jury
questions, it submits questions about whether Moore committed common-law or
statutory fraud against DGO; whether Moore made a negligent misrepresentation
on which DGO justifiably relied; and whether DGO substantially relied to its
detriment on Moore’s promise to fund the transaction.  Third, Altra proposed
several damages questions related to DGO’s claims against Moore.  Fourth, Altra’s
and DGO’s “Tenders from Deposition of Paul Moore,” “Tenders from Deposition of
Tracy Turner,” and “Tenders from Deposition of William C. Collins, II” are
exactly the same.  Altra’s and DGO’s motions in limine are also virtually identical. 
Finally, in Altra’s “Brief in Support of Exclusion of Prior or Subsequent
Contracts of Defendant,” which is included among its pre-trial filings, Altra
never mentions its claim against DGO in the factual background or even charges
that DGO failed to abide by the contract.  Although Altra notes DGO signed an
agreement to purchase Chalkboard, Altra focuses not on its claims against DGO,
but on its claims—and DGO’s claims—against Moore.  

It
is also remarkable how DGO’s and Altra’s pre-trial submissions evolved with the
passage of time.  DGO and Altra were first required to comply with the trial
court’s trial-preparation order in September 2003, and then again in April
2004, both before Moore was a party to the lawsuit.[14]  The last
set of trial-preparation materials was filed in February 2007, after Moore had
been added as a party.[15] 
The first two sets of submissions reflected a stark antagonism between Altra
and DGO at that time.  Specifically, the proposed jury questions DGO submitted
in 2003 and 2004 included multiple affirmative defenses to Altra’s
breach-of-contract claim.  But in its final pre-trial materials, filed after
Moore had been added as a party, DGO submitted none of its affirmative
defenses.  DGO continued to include the defenses in its pleadings—a point DGO
cites as proof it was still antagonistic toward Altra.  But by not including
the defenses in its proposed jury charge, DGO abandoned them.  See Akin v.
Dahl, 661 S.W.2d 911, 913 (Tex. 1983) (stating that an affirmative defense
not submitted to the jury is waived); see generally Tex. R. Civ. P.
279.  Thus we do not consider DGO’s defenses as evidence of antagonism between
it and Altra.  Indeed, the exclusion of the defenses from DGO’s proposed jury
charge is further evidence that DGO and Altra were not in fact antagonistic.

We
next turn to the parties’ voir-dire examinations for evidence of antagonism.  During
his examination, Altra’s attorney told the
venire panel, “[W]e had a contract with [DGO], and we are suing them for breach
of contract because the sale did not go through.”  Altra’s counsel then briefly
described the written contract and explained the liquidated damages of $1.25
million.  He then added:  “Simple as that.  We had a contract, they breached
it.  We’re suing [DGO] for the money.”  Altra then spent the remainder of its
time discussing its fraud claim against Moore.  

DGO’s
attorney began his voir-dire examination this way: 

[Altra’s attorney] explained to you a little bit about this
case, and told you that this case was over a contract to purchase Altra, and
D.G.O. was the company that contracted to purchase Altra and that is a fact. 
As part of that, there are certain funds that were required to be undertaken as
a part of that contract.  That funding was to be provided by Mr. Moore, Mr.
Paul Moore.  

DGO’s
attorney did not dispute the existence or terms of the contract, or deny that
DGO had breached the contract.  Instead, he briefly noted that Altra had sued DGO
for breach of contract, and then immediately turned his focus on Moore.  He discussed
oral promises with the venire panel, but only after noting that “[Altra’s
attorney] spoke a little bit about oral promises, and I know that some of you
had some strong feelings about whether a contract had to be in writing.”  He
mentioned Altra’s contract claim against DGO only one other time: 

Well, we have two claims in this case: we’re defending a
claim against Altra for breach of contract but we also have a D.G.O. claim
against Mr. Moore, what’s called promissory estoppel . . . If you make a
promise and somebody relies upon that promise, and you don’t live up to it and
they take action in reliance on that promise, and then they suffer damages . .
. Does anyone have a problem with that type of legal claim in the absence of a
written contract?  

Once
the general voir-dire examinations were complete, the trial court called in
some of the venire members for individual examinations.  Only Altra’s attorney
and Moore’s attorney asked the venire members any questions at this time;
Altra’s attorney’s first question concerned whether the potential juror could
follow an instruction that might lead to DGO recovering damages for reliance on
a broken promise.  Altra’s counsel then repeatedly asked jurors about oral
promises, reliance, and contracts not in writing, even though its contract with
DGO was in writing.  At one point during voir dire, the trial judge seemed
confused about Altra’s claims and even asked its attorney if Altra had a
breach-of-contract claim in the case.  After Altra’s attorney responded,
“Yeah,” the following discussion occurred:

The Court:                 Wait
a minute. Hold up.

[Altra’s attorney]:    There’s a promissory-estoppel
claim left in the case that D.G.O. has.

[DGO’s attorney]:    That’s
our claim, Your Honor.

The Court:                 Okay so, because I’m not
feeling well today and because I’m probably even slower than normal, was that a
yes or no?

[Altra’s attorney]:    When you – I hate to be
lawyer-like, but when you say do you have a breach of contract claim in this
case: Yes, we do, against D.G.O.

[Moore’s attorney]: And they’re a party to the
contract and there’s a claim in writing; so, there’s no claim of contract.

The Court:                 Which is what I was getting
to.

[Altra’s attorney]:    But there is a party in this
case that does have a claim based upon an oral promise and that’s D.G.O. on
promissory estoppel theory, whole foundation theory can be based upon oral
representation.  

The Court:                 That’s different from the
contract theory.  We’ve been talking to these jurors about written contracts
and agreements and I agree with all that, but that’s a different scenario.

 [Altra’s attorney]:   My question has been narrowly tailored
to promissory estoppel.  

The
trial judge moved on, and Altra continued to ask questions concerning oral
promises and whether contracts needed to be in writing—questions “narrowly
tailored to promissory estoppel.”  

Altra,
of course, sued no one for promissory estoppel.  The only promissory-estoppel
claim is DGO’s against Moore.  From this exchange, Altra appears to be arguing
DGO’s promissory-estoppel claim for DGO, focusing on oral promises in unwritten
contracts.  In its brief, Altra claims these “questions were about oral
promises to perform, which were relevant to Altra’s fraud claim against Moore.”[16] 
But during voir dire, Altra’s attorney told the trial judge his questions were
“narrowly tailored to promissory estoppel.”  Litigants who are antagonistic
toward each other do not spend valuable voir-dire time advocating the viability
of the opponent’s claims.  Altra’s attorney’s voir-dire examination in support
of DGO’s promissory-estoppel claim is evidence the two parties were cooperating
and were not antagonistic.

Shortly
after the trial judge asked about Altra’s breach-of-contract claim, Moore’s
attorney moved to align the parties.  In the motion, Moore’s attorney stated
Altra and DGO had submitted the same motions in limine, same witness lists, and
same depositions.  Moore urged that DGO’s attorney never argued anything separately
from Altra’s counsel, and Altra’s attorney had been arguing a promissory-estoppel
claim which belonged to DGO.  Moore’s attorney also informed the trial court of
a settlement agreement between Altra and David Ownby.  

After
Moore moved to align Altra and DGO, the trial court asked Altra’s attorney how
it was factually adverse from DGO.  Altra’s counsel responded, 

On fraud theory he claims
– D.G.O. claims that Paul Moore said he would fund the deal.  On our fraud
theory we claim that Paul Moore gave information to a bank that the deal was
financeable and – could fund the deal themselves, which was a
misrepresentation, false misrepresentation that we relied on and went forward
with the deal so fraud, the deal is completely separate.  And, of course, breach
of contract is a different issue.        

Noting
that each party was pursuing its fraud claims under different theories,
however, does not show that the parties are themselves antagonistic.  Altra and
DGO were not challenging each other’s version of the facts; they were merely
each relying on different facts to support their particular claims.  Nothing
about Altra’s fraud claims conflicted with DGO’s.  The jury could adopt Altra’s
version of the facts and DGO’s version of the facts and they could still both
win.  Indeed, that is exactly what happened.  Unlike in Lipsey, DGO
never expressly denied it breached the contract.  Nor did DGO state it should
not have to pay damages based on the breach.  See 787 S.W.2d at 634.  This
case is more analogous to Garcia, as both Altra and DGO were blaming Moore
for the failure of the deal.  See Scurlock Oil Co., 724 S.W.2d at
5 (citing Garcia, 704 S.W.2d at 736).  Even though Altra asserted a
breach-of-contract claim against DGO, information disclosed to the trial court
by pre-trial discovery, information and representations made during voir dire,
and any other information brought to the trial court’s attention, including the
lack of antagonism gleaned from the pre-trial filings, overcame any antagonism evinced
in the pleadings.  See Garcia, 704 S.W.2d at 737.  As a matter of
law, the trial court should have aligned Altra and DGO and given each side the
same number of strikes. 

Altra and DGO both argue that even if the trial court
should have aligned the parties, the error was harmless.  But as we have held
in prior cases, when the trial is hotly contested and the evidence is sharply
conflicting, the error from an improper allocation of peremptory challenges
results in a materially unfair trial without showing more.  Van Allen,
35 S.W.3d at 66.  There was a unanimous verdict, but there were also denied
motions for summary judgment, thirteen questions submitted to the jury, and a
denied motion for a directed verdict.  See Marcum, 2008 WL
2388073, at *4 (citing Dunn, 592 S.W.2d at 921).[17]  Altra and
DGO contend the trial was not “hotly contested” and the evidence was not
“sharply conflicting.”  A review of the record proves otherwise.  Accordingly, we
sustain Moore’s first issue.

*
* *

For
the foregoing reasons, we reverse the trial court’s judgment, render a
take-nothing judgment in favor of Moore on Altra’s fraud claim, and remand for
a new trial in accordance with this opinion on the remaining claims.

 

                                                                        

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Yates,
Seymore, and Brown.









[1]
Collins also testified Turner and Moore provided the income statements and
balance sheets, but there was no evidence, or even any allegation, that any
information contained therein was false or misleading. 





[2]
Collins also testified that he did not have the understanding that Moore would
finance the deal himself.  When asked if he knew who would provide the
financing on this particular deal, Collins replied, “No, we did not.”  Collins
also testified the Acquirers as a group could finance the deal, but he believed
Maroon Bells could not finance the deal alone.  





[3]
Moore challenges both of DGO’s fraud claims because it is unclear from the
trial court’s final judgment whether DGO recovered under common-law fraud or
statutory fraud.  Question 12 of the jury charge provides, “If your answer to
Question 5 [common-law fraud] or 6 [statutory fraud] is ‘Yes,’ then answer the
following question.  What sum of money, if any, if paid now in cash, would
fairly and reasonably compensate DGO, Inc. for the damages, if any, that
resulted from such fraud?”  Moore objected to Question 12, but not because the
question did not make the jury specify which type of fraud it found Moore
committed.  Thus, if we conclude the evidence supporting DGO’s common-law-fraud
claim is legally sufficient, we need not discuss whether the evidence of
statutory fraud is also legally sufficient because the jury could have assessed
damages solely on common-law fraud.    





[4]
See supra note 3.





[5]
DGO correctly asserts we only need to address the first two elements of
promissory estoppel because Moore did not challenge the third element.  See
Tex. R. App. P. 38.1(i) (discussing the party must properly brief each issue). 
Thus, we will focus our discussion on whether (1) Moore made a promise to DGO
and (2) DGO reasonably relied on that promise.  





[6]
Both Altra and DGO argue Moore did not move to equalize the peremptory strikes,
but only to align the parties; therefore, Moore failed to preserve the issue
for appeal.  See Tex. R. App. R. 33.1(a).  From the context of the
voir-dire testimony, however, it is apparent that Moore wanted the trial court
to align the parties and equalize the strikes.  It is equally apparent that the
trial court understood what Moore sought.





[7]
The Corpus Christi court of appeals in Pojar v. Cifre notes the trend
for courts in reviewing harm is to “focus on whether the trial was ‘hotly
contested’ and the evidence ‘sharply conflicting,’ rather than on the extent to
which an unfair advantage was actually created by the allocation of challenges.” 
199 S.W.3d 317, 332 (Tex. App.—Corpus Christi 2006, pet. denied).  In Pojar,
the court noted it is hard to imagine a jury trial that is not “‘hotly
contested’”; thus, it appears the harmless-error rule has “become a virtual
rule of automatic reversal.”  Id.  This court, however, follows the
general rule finding harm only if there is an actual showing that the trial is
“hotly contested” and the evidence is “sharply conflicting.”  See Van
Allen, 35 S.W.3d at 66.





[8]
Although Altra argues it asked questions concerning only its claims against
Moore, it is apparent from the voir-dire testimony Altra also inquired about
DGO’s claims against Moore.  





[9]
The one common strike between Altra and DGO was a juror that the court had
already struck on the record for cause. 





[10]
Moore also seeks to rely on information developed after the parties’ exercised
their peremptory strikes, but as Altra and DGO note in their briefs, we can
review only the information the trial court had before the exercising of
strikes.  See Garcia, 704 S.W.2d at 737.   





[11]
The court noted that one scenario that often requires realignment of the
parties is when a litigant on one side has settled with a litigant on the other
side.  718 S.W.2d at 769 (citing Scurlock Oil Co. v. Smithwick, 724
S.W.2d at 5).





[12]
In the majority of the Corpus Christi court of appeals’s cases, the court has
decided, absent a settlement agreement between the parties, the parties can
show they are antagonistic if one party is actively seeking recovery from the
other party.  But in Cecil v. T.M.E. Investments, Inc., the Corpus
Christi court disagreed with the appellee’s contention that its cross-claim
established antagonism as a matter of law, even though prior cases suggested
“antagonism lies in the allegation of another defendant’s sole causation of
plaintiff’s harm.”  893 S.W.2d 38, 55 (Tex. App.—Corpus Christi 1994, no pet.). 
The court stated, “[T]he trial court must consider all the information brought
to its attention and make the antagonism determination within this broader
context.”  Id.





[13]
Although courts, including this court, see
Lipsey, 787 S.W.2d at 639, have looked to see whether the parties’
claims were submitted to the jury, this analysis seems to contradict the rule
that in reviewing antagonism, an appellate court
can only review what the trial court had before it prior to making its
alignment ruling.  Garcia, 704 S.W.2d at 737; Dunn, 592 S.W.2d at
919.  Appellate courts can consider proposed jury questions, but they should
not rely on the fact a question was actually submitted to the jury
because a trial court would not have known that was going to occur until later
in the trial.  We, therefore, will not consider this factor in our
analysis.     





[14]
The litigation began simply enough in June 2002 when Altra sued DGO and its
principals, David and Daniel Ownby.  In 2003, Altra added Fuqua and his law
firm, and then Maroon Bells about a year and half later.  DGO and Fuqua then
brought in Moore.  Altra made its first claims against Moore in its Ninth
Amended Petition in May 2005.





[15]
In 2006, Altra reached settlements with the Ownbys, Fuqua, and Fuqua’s law firm
and dismissed its claims against them.  The only parties remaining at the time
of trial were DGO, Altra, and Moore.





[16]
The following is an example of type of question Altra’s attorney was asking
potential jurors: “Assume at the close of evidence in the case the judge asks
you a question that allows somebody to recover damages based upon a broken oral
promise, will you be able to render your verdict based upon the evidence or
would you unequivocally require a contract in order to render a verdict in the
case?”





[17]
Factors that indicate a hotly contested trial can include whether the verdict
was unanimous, the number of questions submitted to the jury, and whether there
was a motion for an instructed verdict or motion for summary judgment.  Marcum
v. Marcum, No. 01-04-01062-CV, 2008 WL 2388073, at *4 (Tex. App.—Houston
[1st Dist.] June 12, 2008, no pet.) (mem. op.) (citing Dunn, 592 S.W.2d
at 921).  In Van Allen, we concluded if the evidence was “sharply
conflicting” then nothing more was needed to show reversible error.  35 S.W.3d
at 66.  Nevertheless, we noted that there was a motion for summary judgment,
which was denied; twenty-one questions submitted to the jury; and a motion for
a directed verdict, which was denied.  Id.